John Espiredion **VALERIO,**
**Petitioner–Appellant,**

**v.**

**Jackie CRAWFORD, Director of the Department of Prisons; E.K. McDaniel, Warden, Respondents–Appellees.**

No. 98–99033.

United States Court of Appeals, Ninth Circuit.

Rehearing En Banc Granted June 12, 2001.

Argued and Submitted En Banc Sept. 24, 2001.

Filed Sept. 17, 2002.

Lawrence D. Wishart, Mary·Beth Gardner, Reno, Nevada, for petitioner-appellant.

Frankie Sue Del Papa, David F. Sarnowski, Robert E. Wieland, Dorothy Nash Holmes, Office of the Attorney General, Las Vegas, NV, for respondent-appellee.

Franny A. Forsman, Michael Pescetta, Office of the Federal Public Defender, Las Vegas, NV, for Amicus Curiae.

Before SCHROEDER, Chief Judge, REINHARDT, O'SCANNLAIN, RYMER, T.G. NELSON, THOMAS, GRABER, W. FLETCHER, FISHER, PAEZ, and BERZON, Circuit Judges.

Opinion by Judge WILLIAM A. FLETCHER; Concurrence by Judge FISHER; Dissent by Judge RYMER.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

In this capital case, petitioner John Espiredion·Valerio appeals the district court's dismissal of his petition for writ of habeas corpus under 28 U.S.C. § 2254. We decide as follows:

First, we reverse the district court's dismissal of Valerio's habeas petition as to the penalty phase of his trial. During the penalty phase, the jury was instructed to determine whether the murder with which Valerio was charged "involved torture, depravity of mind, or mutilation of the victim." The jury concluded that this aggravating circumstance was present and, based in part on this conclusion, sentenced Valerio to death.

The jury instruction was clearly unconstitutional under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). On appeal from a denial of state post-conviction collateral relief, the Nevada Supreme Court sought to cure the error pursuant to the procedure endorsed in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled in part by Ring v. Arizona*, —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), by applying a narrowing construction of the instruction to a *de novo* finding of the facts. We hold that the *Walton* procedure is not available when a jury rather than the trial judge has ·found the facts and determined whether there were aggravating and mitigating circumstances. We also hold that, even if the *Walton* procedure were available, the Nevada Supreme Court failed to provide "close appellate scrutiny" and therefore failed to cure the instructional error. Evaluating the effect of the error under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d

353 (1993), we hold the error not harmless. We therefore remand with instructions that, should the district court upon remand deny Valerio's claims as to the guilt phase of his trial, it shall grant the writ as to the penalty phase and shall provide any appropriate interim relief.

Second, we address the effective date of our Circuit Rule 22–1. The district court granted a certificate of appealability ("COA") on the issue of the unconstitutional aggravator, but it refused to grant a COA on issues in two groups of additional claims relating to the guilt phase. Valerio sought to expand the COA to encompass the issues in these additional claims by briefing them to us, as expressly permitted under our decision in *United States v. Cruz–Mendoza*, 147 F.3d 1069, 1074–75 (9th Cir.1998) (*Cruz–Mendoza I* ), *amended and superseded in part by United States v. Cruz–Mendoza*, 163 F.3d 1149 (9th Cir.1998) (*Cruz–Mendoza II* ). Our Circuit Rule 22–1 sets forth procedural requirements for appellants seeking to expand a partially-denied COA which Valerio did not, and could not, satisfy. We hold that because Rule 22–1 went into effect after the district court denied the COA as to these other issues, it does not apply to Valerio's request for an expanded COA. We therefore hold that Valerio's request for an expanded COA on the additional issues briefed is properly before us.

Third, we address the first group of additional guilt-phase claims. That group consists of three claims newly added to Valerio's amended federal habeas petition. The district court dismissed these claims for abuse of the writ under *Farmer v. McDaniel*, 98 F.3d 1548 (9th Cir.1996). After the district court's decision, the Supreme Court reversed *Farmer* in *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Based on *Slack*, we grant the expanded COA, reverse the dismissal of these claims, and remand to the district court for appropriate action.

Fourth, we address the second group of additional guilt-phase claims. This group consists of claims that the district court declined to decide on the ground that they had been procedurally defaulted in state court. We hold that the claims were not procedurally defaulted. We grant the expanded COA, reverse the dismissal of these claims, and remand to the district court for appropriate consideration.

## I. Background

In 1988, a Nevada jury convicted petitioner-appellant Valerio of first degree murder with the use of a deadly weapon for the killing of Karen Sue Blackwell. Valerio had killed Blackwell by stabbing her 45 times. During the separate penalty proceeding, the jury found two aggravating circumstances: first, that Valerio had a prior violent felony conviction and second, that the murder "involved torture, depravity of mind, or mutilation." The jury returned a verdict of death.

Valerio appealed his conviction, arguing that he was prejudiced by prosecutorial misconduct and by the introduction of certain photographs at trial. The Nevada Supreme Court denied his direct appeal in September 1989. Valerio then filed a petition for post-conviction relief in state court pursuant to Nevada Revised Statute (NRS) Chapter 177. The petition claimed, *inter alia*, ineffective assistance of counsel ("IAC") and unconstitutionality of a penalty phase aggravating circumstance jury instruction requiring a finding of "torture, depravity of mind, or mutilation of the victim." After conducting an evidentiary hearing, the Nevada district court denied Valerio's petition in November 1990, rejecting all of his claims. The Nevada Supreme Court affirmed the denial in January 1992.

Valerio then filed a petition for habeas corpus in federal district court under 28 U.S.C. § 2254, alleging 18 claims for relief, some of which had not been exhausted in state court. Because the petition was "mixed," containing exhausted and unexhausted claims, the district court dismissed it under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). In December 1992, Valerio filed a second state petition for post-conviction relief in Nevada district court, this time a petition for habeas corpus under NRS Chapter 34.[1] This petition alleged 24 claims for relief, including two claims based on ineffective assistance of counsel. The state district court dismissed the entire petition as procedurally barred under NRS 34.810. In April 1996, the Nevada Supreme Court affirmed the dismissal of Valerio's petition as procedurally barred. *See Valerio v. State,* 112 Nev. 383, 915 P.2d 874 (Nev. 1996).

In May 1996, Valerio filed a second petition for habeas corpus in federal district court. That petition, the focus of the present appeal, asserts the same 24 claims for relief that Valerio had presented to the Nevada state courts in his second state petition. As amended in December 1996, the petition also asserts three additional claims. Two claims assert further factual grounds supporting the claims of IAC. One claim asserts a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The federal district court dismissed most of Valerio's claims as procedurally defaulted in state court. The court then rejected the three newly added claims as an abuse of the writ under federal law. Finally, the court entered judgment denying Valerio's remaining claims on the merits and dismissed his petition on August 20, 1998. Valerio applied for a COA generally on all issues decided against him by the district court. He specifically applied for a COA on claim 13 (improper closing argument by the prosecutor in the penalty phase), claim 14 (unconstitutionally vague instruction on aggravating circumstance in the penalty phase), and claim 15 (insufficient evidence of torture and mutilation under the aggravating circumstance). On October 15, 1998, the district court granted the COA as to the issues in claims 13, 14, and 15 and denied certification as to all other issues.

Valerio appealed the district court's dismissal on the merits of claims 14 and 15.[2] He also sought to appeal the uncertified issues of whether the district court properly dismissed his other claims as procedurally defaulted or abusive. In an unpublished memorandum disposition, a three-judge panel of this court affirmed the district court's dismissal. The panel affirmed the district court's ruling on the merits of claims 14 and 15, concluding that the Nevada Supreme Court had cured any instructional error by applying a narrowing construction to the aggravating circumstance under *Walton,* 497 U.S. at 653–54, 110 S.Ct. 3047. Relying on Ninth Circuit Rule 22–1, the panel refused to consider the other issues Valerio had sought to appeal, through an expanded COA, when

---

**1.** Between 1967 and 1993, there were two types of post-conviction relief available to petitioners in Nevada: one under NRS Chapter 177 (post-conviction relief), and one under NRS Chapter 34 (habeas corpus). *See Pellegrini v. State,* 117 Nev. ——, 34 P.3d 519, 526–28 (Nev.2001) (per curiam) (explaining history of Nevada post-conviction remedies).

As of January 1, 1993, the sole post-conviction remedy available to petitioners in Nevada is a petition for a writ of habeas corpus; the procedures for seeking the writ are codified in NRS Chapter 34. *See id.*

**2.** Valerio did not pursue an appeal for claim 13.

he argued in his briefs that his other claims were neither procedurally defaulted nor abusive. We have taken Valerio's appeal en banc and have vacated the panel's decision.

## II. Depravity of Mind Jury Instruction

■ We first address Valerio's penalty-phase claim that a jury instruction on an aggravating circumstance was unconstitutional. We address this claim even though, as will be seen later in the opinion, we remand several guilt-phase claims for further consideration. We have previously addressed penalty-phase claims while guilt-phase claims remain to be adjudicated. *See Morris v. Woodford,* 273 F.3d 826, 828 (9th Cir.2001) (granting writ with respect to death sentence while guilt-phase claims remain to be decided). We recognize that if one of Valerio's guilt phase claims is sustained (which, of course, is by no means certain), his entire conviction will be set aside, making it unnecessary to decide his penalty-phase claim. However, for two reasons, we believe it is appropriate to address the penalty-phase claim now. First, the penalty-phase claim is before us and ready to be decided. The district court has decided it and granted a COA, the parties have briefed and argued it, and the claim is as ripe for decision as it will ever be. Second, even if it eventually turns out that Valerio's conviction is set aside, interim forms of relief short of release from incarceration, such as removal from death row, may be appropriate based on the fact that he will no longer be under sentence of death.

At the conclusion of the penalty phase of Valerio's trial, the jury was directed to determine whether the murder "involved torture, depravity of mind, or mutilation of the victim." Valerio argues that the "depravity of mind" portion of the instruction, and therefore the instruction as a whole, were unconstitutionally vague. The district court granted a COA on claim 14, concerning the unconstitutionality of the jury instruction. Valerio argues that the unconstitutionality of the instruction requires that we grant his petition as to the penalty phase of his trial. For the reasons that follow, we agree.[3]

## A. Unconstitutionality of the Instruction

■■ It is clear that the aggravating-circumstance instruction concerning depravity of mind, in the form in which it was given to the jury, was unconstitutional. The Eighth Amendment requires that jury instructions in the penalty phase of a capital case sufficiently channel the jury's discretion to permit it to make a principled distinction between the subset of murders for which a death sentence is appropriate and the majority of murders for which it is not. *See Wade v. Calderon,* 29 F.3d 1312, 1319 (9th Cir.1994). When a jury is given an aggravating-circumstance instruction that would support the imposition of the death penalty, that instruction "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to

---

**3.** Later in this opinion, we hold that the district court erred in dismissing three newly added claims for abuse of the writ. *See infra,* Part IV. It is possible, though not certain, that none of these claims is exhausted. Because the district court had dismissed these three claims, the petition was not a mixed petition when the district court denied Valerio's claim that the aggravating circumstance jury in-

struction was unconstitutional. However, as a result of our reversal of the district court's dismissal of these claims, the petition has become mixed. We nonetheless believe that it is appropriate for us to rule on Valerio's appeal of the district court's decision on the merits of his exhausted jury instruction claim. *See* discussion *infra,* Part IV.

others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *see also Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.").

In *Godfrey v. Georgia*, the Supreme Court held unconstitutional an aggravating-circumstance instruction that permitted a jury to impose the death penalty if it found that the murder " 'was outrageously or wantonly vile, horrible or inhuman in that it involved torture, *depravity of mind*, or an aggravated battery to the victim.' " 446 U.S. at 428–29, 100 S.Ct. 1759 (quoting state statute) (emphasis added). The instruction in *Godfrey*, unconstrained by a narrowing construction, resulted in "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id.* at 429, 100 S.Ct. 1759. *See also Maynard v. Cartwright*, 486 U.S. 356, 363–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (holding unconstitutionally vague, under the reasoning of *Godfrey*, an aggravating-circumstances instruction directing jurors to determine whether the murder was "especially heinous, atrocious, and cruel").

Applying *Godfrey*, we held in *Deutscher v. Whitley*, 884 F.2d 1152 (9th Cir.1989), *vacated on other grounds sub nom. Angelone v. Deutscher*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991), that the "depravity of mind" phrase in the Nevada jury instruction was unconstitutional. We held that the torture and mutilation parts of the instruction were "sufficiently clear and objective to satisfy the requirements of *Godfrey*," but held that the depravity of mind part of the instruction was unconstitutionally vague.

There is nothing in the definition of depravity of mind that restrains arbitrary imposition of the death penalty. The depravity instruction in this case ... is no more capable of channeling discretion than the 'especially heinous, atrocious, or cruel' instruction rejected in *Maynard* or the 'outrageously or wantonly vile, horrible or inhuman' instruction in *Godfrey*.

*Id.* at 1162 (citation omitted); *see also McKenna v. McDaniel*, 65 F.3d 1483, 1489 (9th Cir.1995) (holding unconstitutionally vague a similar Nevada depravity of mind instruction).

Our decision in *Deutscher* was rendered on August 31, 1989. The Nevada Supreme Court decided Valerio's direct appeal from his conviction and sentence six days later, on September 6, 1989. It said nothing about *Godfrey* and *Deutscher*, and nothing about the constitutionality of the instruction.

The Nevada Supreme Court responded to *Godfrey* and *Deutscher* a year later, in *Robins v. State*, 106 Nev. 611, 798 P.2d 558 (Nev.1990), by providing a narrowing construction to the depravity of mind aggravating circumstance instruction. It wrote in *Robins*: "[W]e construe the instruction and the statute (NRS 200.033(8)) upon which it is based as requiring *torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself*, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind." *Id.* at 629, 798 P.2d 558 (emphasis added).

## B. State Court Proceedings

Nevada is a "weighing" state. *See McKenna*, 65 F.3d at 1489. In arriving at a penalty decision in a capital case, a Nevada jury is directed to weigh aggravating

against mitigating circumstances. A Nevada jury may return a verdict of death for a death-eligible defendant "only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found .do not outweigh the aggravating circumstance or circumstances." NRS 200.030(4)(a); *see also* NRS 175.554.

After the presentation of evidence at the penalty phase of Valerio's trial, the jury was instructed that it could find three possible aggravating circumstances. The constitutionality of the jury instruction as to two of them is not in question. The first was that "[t]he murder of Karen Sue Blackwell was committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another." The second was that "[t]he murder was committed while the person was engaged in the commission of any robbery." The jury found the first of these two circumstances present, but not the second.

The third aggravating-circumstance instruction directed the · jury to decide whether "[t]he murder of Karen Sue Blackwell by the defendant involved torture, *depravity of mind* or the mutilation of the victim" (emphasis added). Neither "torture" nor "mutilation of the victim" was defined in the instructions. "Depravity of mind" was defined as follows:

> The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

The prosecutor's argument concerning the third aggravating-circumstance instruction·was, in its entirety:

The next aggravating circumstance which you would be able to find is that the murder, I'm not going to remember the exact wording, included or the person doing—let me get the instruction. I don't want to be wrong. The murder involved torture, depravity of mind or the mutilation of the victim. Did this killing involve any of those things?

Let's just talk about depravity of mind. We all understand mutilation, disfigurement of the body. We all understand torture, systematic harming of someone while they're alive. Let's talk about depravity because that is defined for you since it's not a word often used. [The prosecutor then read the depravity of mind instruction.] It's pretty bad.

We have a body here, the body of Karen Sue Blackwell, which had 45 knife wounds, three, I can't remember the number, some abrasions to the top of . her head. This body was mutilated, was it not from the top of the head to the vaginal area. That body was mutilated, pure and simple. That must be the definition of mutilation.

Did it happened [sic] during torture? We don't know that, although I will allude to the—you've probably looked at the pictures now and there is that thing that was called a tie wrap, I think, by one of the officers. It's a noose. That's what it is. Let's not call it a tie wrap any more. It's a noose. It was not used to choke. There's no evidence of that. Maybe a leash would be a better term. Maybe somebody put that around the neck of Karen Sue Blackwell not to drag it any place because there are no marks on the throat but to control. Does that start to hint of a depraved mind? All these things together, knife wounds in the front and the back, all over the arms, on the top of the head.

This was a depraved, a depraved human being who did these acts.

And I'm not going to argue to you that he tortured her because we don't know for sure that that's what happened, that he was doing it while she was awake and wanted her to suffer. But, but I think the evidence clearly shows depravity of mind and mutilation, and you only need one of those for another aggravating circumstance.

We may summarize the prosecutor's argument fairly simply. He disavowed reliance on the "torture" part of the instruction because, in his view, the evidence did not support it: "I'm not going to argue to you that he tortured her because we don't know for sure that that's what happened[.]" Instead, he relied on the two other parts of the instruction. He relied on "mutilation of the victim," emphasizing the 45 knife wounds and the "abrasions" on the top of the victim's head. And he relied on "depravity of mind," emphasizing the wounds and the "noose" or "leash" around the victim's neck.

The jury found that the murder "involved torture, depravity of mind or the mutilation of the. victim." The jury found as a mitigating circumstance that at the time of the crime Valerio was gainfully employed and that his employer spoke well of his service. The jury found that the mitigating circumstance was insufficient to outweigh the two aggravating circumstances and imposed a sentence of death. Valerio appealed his conviction and death sentence directly to the Nevada Supreme Court.

Valerio "enumerated" only two errors in his direct appeal—first, that a photograph of the victim holding her daughter, as well as autopsy photographs, had been improperly admitted; and, second, that an argument by the prosecutor that Valerio should not be given "the opportunity to kill any-one again" was improper. The Nevada Supreme Court affirmed Valerio's conviction in an unpublished order. It held that the admission of the photograph of the victim with her daughter had been improper but not prejudicial, and that the admission of the autopsy photographs had been properly within the discretion of the trial court. It further held that the prosecutor's argument had been improper but not prejudicial.

In addition to any "errors enumerated" by a defendant sentenced to death, the Nevada Supreme Court is required by statute to address three issues *sua sponte* on direct appeal. The statute provides, in pertinent part:

2. Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:

(a) Any errors enumerated by way of appeal;

(b) *Whether the evidence supports the finding of an aggravating circumstance or circumstances;*

(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and

(d) Whether the sentence of death is excessive, considering both the crime and the defendant.

NRS 177.055(2) (emphasis added).

In affirming Valerio's conviction, the Nevada Supreme Court addressed only the two issues listed in NRS 177.055(2)(c) and (d). As to those two issues, it wrote:

[O]ur review of the record reveals that Valerio's sentence was not imposed under the influence of passion, prejudice or any arbitrary factor, and that the sentence of death pronounced by the jury

does not constitute excessive punishment, given the magnitude and circumstances of the crime.

The court did not address the issue it was required to consider under NRS 177.055(2)(b)—whether the evidence supported the jury's finding of the two aggravating circumstances.

In affirming Valerio's conviction and sentence, the Nevada Supreme Court did not mention the United States Supreme Court's decision in *Godfrey*, rendered eight years earlier, which had made clear that a depravity of mind aggravating—circumstance instruction was unconstitutionally vague. The court also did not mention our decision in *Deutscher*, rendered only six days earlier, which had specifically applied *Godfrey* to the Nevada depravity of mind instruction.

After his conviction and sentence were affirmed on direct appeal, Valerio petitioned for post-conviction collateral review in state court under NRS Chapter 177. Valerio contended in his petition, *inter alia*, that the depravity of mind instruction was unconstitutionally vague. The state district court noted that Valerio had not raised the unconstitutionality of the instruction on direct appeal, but it nonetheless addressed (and rejected) the argument on the merits.[4] It wrote:

> The argument that the aggravating circumstance "depravity of mind" is unconstitutional and renders the petitioner's death penalty invalid was not raised on direct appeal. However, the Supreme Court has declared the term "de-

pravity of mind" as being language that is "plain and intelligible" and not constitutionally vague. *Rogers v. State*, 101 Nev. 457, 467, 705 P.2d 664 (1985). See also: *Deutscher v. State*, 95 Nev. 669, 687, 601 P.2d 407 (1979) and *McKenna v. State*, 101 Nev. 338, 351, 705 P.2d 614 (1985). The Supreme Court recently reaffirmed the depravity of mind instruction in *Robins v. State*, Nev. Adv. Op. 108, filed September 19, 1990, wherein it distinguished the case from *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

> The death sentence is not solely based upon a "depravity of mind" aspect. This case involved torture of the deceased. The petitioner stabbed the victim 45 times with the intent to cause cruel pain and suffering for some sadistic purpose and such acts involved a high probability of death. *Deutscher v. State*, 95 Nev. 669, 601 P.2d 407 (1979).

The Nevada district court thus provided two responses to Valerio's argument. First, as to the depravity of mind instruction, the court held that it was not unconstitutionally vague. The court wrote that the Nevada Supreme Court had "declared the term 'depravity of mind' as being ... not constitutionally vague" in *Rogers v. State* in 1985, and that it had "recently reaffirmed the depravity of mind instruction" in *Robins v. State* in 1990. In fact, however, the Nevada Supreme Court had not "reaffirmed" the constitutionality of the instruction in *Robins*. Rather, it had done just the opposite; based on *Godfrey*,

4. The words chosen by the state district court make clear that it addressed defendant's argument on the merits, rather than addressed in an advisory fashion an argument it considered waived. It noted that the argument "was not raised on direct appeal," and then went on to discuss the argument and reject it on the merits. It never stated that it was treating the argument as waived. By con-

trast, the district court explicitly treated petitioner's next argument as waived. In the paragraph immediately following its discussion of the constitutionality of the aggravating circumstance, it wrote, "Petitioner's contention that he had not been formally convicted of the offense against Angela Howell was not raised on the direct appeal *and is considered waived*. NRS 177.375" (emphasis added).

it had held the instruction unconstitutional and had provided a new, narrowed construction. The state district court neither described the narrowed construction provided in *Robins*, nor tried to evaluate the evidence under that narrowed construction. The court did not mention our decision in *Deutscher* holding that the Nevada depravity of mind instruction was unconstitutional; instead, it cited only an earlier state court decision in that case.

Second, the state district court held that there was, in any event, torture within the meaning of the instruction. It did not mention the fact that the prosecutor, in his closing argument to the jury, had specifically stated that the evidence did not show torture. It did not discuss the fact that there was no evidence of torture beyond the wounds themselves. And it did not mention the fact that there was no evidence of the killer's "intent" or "sadistic purpose" beyond the nature of the wounds.

■ Valerio appealed the state district court's denial of his post-conviction petition to the Nevada Supreme Court. In an unpublished order, that court rejected on the merits Valerio's argument that the depravity of mind instruction was unconstitutional.[5] It wrote in a footnote:

> [Valerio] contends that the jury was improperly instructed. We agree with the district court that the murder of Karen Blackwell involved torture (or serious physical abuse). In *Robins v. State*, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990), we recognized that a depravity of mind instruction must include "torture, mutilation or other serious and depraved physical abuse beyond the act of killing

itself, as a qualifying requirement to [the] aggravating circumstance." In this case, evidence that Ms. Blackwell was stabbed more than forty-five times, had "defensive wounds" on her hands and arms, and died not from one wound but from all wounds combined, satisfies us that she was subjected to torture and/or serious physical abuse before she died. As in *Robins*, we thus conclude that the depravity of mind instruction in Mr. Valerio's case was not unconstitutionally vague as applied.

The Nevada Supreme Court's response to Valerio's argument may be summarized as follows: It first "agreed" with the state district court that the murder "involved torture (or serious physical abuse)," even though the state district court had held only that the murder involved torture. Then, unlike the state district court, it discussed, and relied on, the narrowed construction of the instruction supplied in *Robins*. Finally, it held that the evidence in the case "satisfies us" that there had been "torture and/or serious physical abuse" before the victim's death. Like the state district court, the Nevada Supreme Court did not mention that the prosecutor had disavowed any conclusion that there had been torture, or discuss the evidence (or lack thereof) supporting a conclusion that Valerio intended to torture the victim.

### C. Failure of the Nevada Supreme Court to Cure the Erroneous Jury Instruction

■ Because the depravity of mind aggravating-circumstance instruction, as given to Valerio's jury, was unconstitutionally

---

5. Because the Nevada Supreme Court rejected Valerio's claim on the merits, there is no obstacle to our reviewing it on habeas corpus. "If a state appellate court overlooks the procedural default and considers an objection on the merits, the state has not relied on the

procedural bar and the federal courts may review the claim." *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir.2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir.2002) (en banc).

vague under *Godfrey, see* 446 U.S. at 427–30, 100 S.Ct. 1759; *see also Deutscher,* 884 F.2d at 1162–63; *McKenna,* 65 F.3d at 1489, the use of that instruction at Valerio's sentencing was contrary to clearly established law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.").

■ When a state trial court sentences a defendant to death based in part on an unconstitutionally vague aggravating circumstance, the state appellate court may affirm the sentence in three ways. First, it can find the error harmless under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under *Chapman,* the state appellate court can affirm if it finds beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance. *See Clemons v. Mississippi,* 494 U.S. 738, 752–53, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)

(approving *Chapman* harmless error analysis as method for curing unconstitutional jury instruction).

Second, a state appellate court can cure the error by the method approved in two cases decided the same day, *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). (For ease of discussion, we refer to this method as a *Walton* analysis.) In a *Walton* analysis, a state appellate court provides a narrowed construction of the unconstitutional aggravating circumstance, and then itself performs a *de novo* evaluation of the evidence to determine if the aggravating circumstance exists.[6] As the Court wrote in *Walton,* "a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined." 497 U.S. at 654, 110 S.Ct. 3047. As it elaborated in *Jeffers,* "a state court's finding of an aggravating circumstance in a particular case" is "a *de novo* finding by an appellate court" that the fact of the aggravating circumstance exists. 497 U.S. at 783, 110 S.Ct. 3092.

In performing a *Walton* analysis, the state appellate court is not reviewing a lower court finding for correctness; it is,

---

6. In *Ring v. Arizona,* —— U.S. ——, ——, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556 (2002), the Supreme Court held, on direct review of the Arizona Supreme Court, that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," thereby invalidating the Arizona practice under which the trial judge acted as a factfinder to determine the existence of aggravating and mitigating circumstances at the penalty phase. The Court wrote that it overruled *Walton* "in relevant part." *Id.* The only question directly before the Court in *Ring* was whether a state trial judge may find aggravating and mitigating circumstances. The related question of whether a state appellate court

may cure an unconstitutional jury instruction by finding an aggravating circumstance was not directly before the Court. Although it appears to us inescapable that this aspect of *Walton* is invalid under the rationale of *Ring,* we do not assume, for purposes of our analysis, that it has been overruled.

We also do not reach the question of whether, if *Ring* overrules appellate court factfinding under *Walton,* that ruling is applicable on federal habeas corpus as a "watershed rule[ ] of criminal procedure" that "implicate[s] the fundamental fairness of the trial." *Teague v. Lane,* 489 U.S. 288, 311, 312, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); 28 U.S.C. § 2254(d)(1).

instead, acting as a primary factfinder. A *Walton* analysis is available not only when the trial judge knows, or is presumed to know, the narrowing construction. *See Walton*, 497 U.S. at 653, 110 S.Ct. 3047. It is also available when the "trial judge fails to apply the narrowing construction or applies an improper construction." *Id.* at 653–54, 110 S.Ct. 3047. The Supreme Court has applied a *Walton* analysis only in *Walton* and *Jeffers*. In both of these cases, the penalty-phase factfinder at trial was a judge. The Supreme Court has never applied, or approved, a *Walton* analysis where the factfinder was a jury.

Third, a state appellate court can cure a penalty-phase instructional error by "reweighing" aggravating and mitigating circumstances under *Clemons*, 494 U.S. at 748, 110 S.Ct. 1441. If the appellate court does not use a *Walton* analysis to find the existence of an aggravating circumstance that had been found at trial under an erroneous standard, that aggravating circumstance cannot be relied upon, in any respect, to affirm a death sentence. But under *Clemons*, a state appellate court may nonetheless affirm the death sentence by disregarding the aggravating circumstance found under an invalid instruction, and then reweighing the remaining valid aggravating and mitigating circumstances.

Reweighing under *Clemons* differs significantly from a *Walton* analysis. Under *Clemons*, the state appellate court reweighs aggravating and mitigating circumstances that have already been found by a jury to exist. The appellate court does no independent factfinding, but rather relies on facts already found by the jury. That is, under *Clemons*, the appellate court evaluates and "reweighs" the aggravating and mitigating circumstances, but it does not independently determine whether those circumstances exist. Under *Walton*, by contrast, the appellate court applies a narrowing construction and then does its own independent *de novo* factfinding to determine whether the evidence supports the existence of one or more aggravating circumstances under the narrowed construction. Further, a *Clemons* reweighing is performed when the penalty-phase factfinder was a jury. *See Clemons*, 494 U.S. at 745, 110 S.Ct. 1441 ("Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravated circumstances found by the jury, but affirms the death sentence after itself finding that the one or more valid remaining aggravating factors outweigh the mitigating evidence."). Under *Walton*, by contrast, appellate court factfinding is done only when the factfinder was a judge.[7]

In reviewing the state district court's denial of Valerio's post-conviction petition, the Nevada Supreme Court in this case did not perform a harmless-error analysis under *Chapman*. Nor did it reweigh under *Clemons*. Rather, it affirmed the sentence by applying a narrowed construction and engaging in *de novo* factfinding under *Walton*. We must decide whether the Nevada Supreme Court thereby succeeded in curing the unconstitutionally vague jury instruction. For two independently sufficient reasons, we conclude that it did not.

---

7. Because the dissenting opinion does not recognize the distinction the Supreme Court has drawn between state appellate court factfinding under *Walton* and reweighing under *Clemons,* it erroneously concludes that the Supreme Court has approved appellate court factfinding under *Walton* when the trial court factfinder was a jury. The dissent cites no case in which the Supreme Court has approved a *Walton* analysis when the factfinder was a jury.

1. *Walton* Appellate Factfinding is Not Available When the Penalty–Phase Factfinder was a Jury

■ The Supreme Court has approved *Walton* appellate court factfinding only in cases in which the factfinder during the penalty-phase trial was a judge. *See Walton; see also Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). The Court has never applied *Walton* to cases in which the factfinders were juries. Indeed, the Court explicitly stated in *Walton* that its reasoning did not apply to jury cases. The petitioner-defendant in *Walton* had argued under the reasoning of *Maynard v. Cartwright* and *Godfrey v. Georgia* that the unconstitutionally vague aggravating circumstance applied by the trial judge in his case required that the death sentence be vacated. In both *Maynard* and *Godfrey,* the Supreme Court had reversed death sentences outright because of unconstitutionally vague aggravating circumstances contained in jury instructions. However, the Supreme Court in *Walton* found *Maynard* and *Godfrey* not controlling because the death sentences in those cases had been imposed by juries. It wrote:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in Maynard and Godfrey. *But the logic of those cases has no place in the context of sentencing by a trial judge.*

*Walton,* 497 U.S. at 653, 110 S.Ct. 3047 (emphasis added).

The Nevada Supreme Court itself now agrees that the *Walton* appellate factfinding procedure is not available when the penalty-phase factfinder was a jury. In Valerio's case, the Nevada Supreme Court applied a *Walton* analysis (although without invoking *Walton* by name) to apply the narrowing construction supplied by *Robins* and to find the facts *de novo.* But in a later case, *Pertgen v. State,* 110 Nev. 554, 875 P.2d 361 (Nev.1994) (per curiam), *abrogated in part on other grounds by Pellegrini v. State,* 117 Nev. ——, 34 P.3d 519 (Nev.2001), the Nevada Supreme Court held that the *Walton* procedure could not be applied in Nevada because juries are the penalty-phase factfinders in that state. It wrote:

> Although the Court [in *Walton* ] upheld the imposition of the death penalty, *Walton* is factually distinguishable from the present case. In *Walton,* the death sentence was imposed by a trial judge, who is presumed to know the law and to apply it in a constitutional manner. By contrast, in this case, the death sentence was imposed by a jury.

*Id.* at 562–63.

■ We agree with the Nevada Supreme Court's holding in *Pertgen. Walton* does not allow a state appellate court to apply a narrowing construction to an unconstitutional instruction, and to engage in *de novo* factfinding, when the penalty-phase factfinder has been a jury. We therefore conclude that the Nevada Supreme Court's *de novo* factfinding under *Walton* did not—because it could not—cure the error caused by the unconstitutionally vague jury instruction.

2. The Nevada Supreme Court Did Not Provide "Close Appellate Scrutiny"

■ Even if we assume that *Walton* could have been used to cure an unconstitutionally vague aggravating-circumstance jury instruction, the Nevada Supreme Court did not fulfill its responsibilities under *Walton.* The Supreme Court has emphasized that a state appellate court must

engage in "close appellate scrutiny" when affirming a death verdict where an unconstitutionally vague aggravating circumstance was applied at trial, and the Nevada Supreme Court did not provide such scrutiny.

A state appellate court cannot "affirm a district court without a thorough analysis of the role an invalid aggravating factor played in the sentencing process." *Stringer v. Black*, 503 U.S. 222, 230, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). In *Clemons v. Mississippi* the Supreme Court could not be sure that the state Supreme Court had performed a proper reweighing or had conducted an appropriate harmless-error analysis, and it refused to accept that court's "cryptic holding." 494 U.S. at 753, 110 S.Ct. 1441. In *Sochor v. Florida*, 504 U.S. 527, 540, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the Supreme Court noted that while it did not require a "particular formulaic indication" that the state appellate court had performed constitutional harmless-error analysis, it could not accept "allusions by citation" that stopped "far short of clarity." According to the Supreme Court in *Stringer*, "[w]e require *close appellate scrutiny* of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases." 503 U.S. at 230, 112 S.Ct. 1130 (citing cases) (emphasis added); *see also Jeffers v. Lewis*, 38 F.3d 411, 414 (9th Cir.1994) (en banc) ("*Close state appellate scrutiny* is required.") (emphasis added).

We therefore examine the decision of the Nevada Supreme Court in this case to determine whether it gave the required "close appellate scrutiny" to the "import and effect of [the] invalid aggravating factor" in this case. *Stringer*, 503 U.S. at 230, 112 S.Ct. 1130; *Jeffers*, 38 F.3d at 414. In the context of this case, we must determine whether the Nevada Supreme Court actually performed the analysis contemplated by *Walton*. That analysis requires two steps. First, the state appellate court must provide a constitutionally adequate narrowing construction to the unconstitutionally vague aggravating circumstance. Second, the appellate court must make an independent, *de novo* determination of whether the evidence introduced at trial proves the existence of the narrowed aggravating circumstance. *See Walton*, 497 U.S. at 645–46, 654, 110 S.Ct. 3047.

The Nevada Supreme Court performed the first step in *Robins*, by construing the depravity of mind instruction to require "torture, mutilation, or other serious and depraved physical abuse beyond the act of killing itself." The Nevada Supreme Court then purported to perform the second step when it applied that narrowed construction to Valerio's case. *See* order, quoted *supra*, p. 18. However, it is apparent from its order that the Nevada Supreme Court did not properly perform the second step of its *Walton* analysis. The court recited accurately the narrowing *Robins* construction. But it is clear from the face of the order that the court's evaluation of the evidence under the narrowed instruction did not meet the United States Supreme Court's standard of "close appellate scrutiny."

First, the Nevada Supreme Court stated that it "agree[d]" with the state district court that the murder involved "torture (*or* serious physical abuse)" and that it was "satisfied" that the evidence showed that there was "torture *and/or* physical abuse" (emphases added). We conclude, from the use of the word "or" and the phrase "and/or," that the Nevada Supreme Court may have meant to do no more than to agree with the district court's finding of torture. Agreement with the state district court on

torture was a clearly insufficient basis upon which to affirm the conviction. *Robins* had narrowed the definition of "torture" by adding the qualification that any torture had to be "beyond the act of killing itself." However, the district court had not applied that limiting language in finding that there had been torture; rather, it had mischaracterized *Robins* as "reaffirming" the constitutionality of the depravity of mind instruction as it had been given. (Although it is not strictly relevant to our analysis, we also note that the prosecutor conceded in his closing argument to the jury that there had *not* been torture. Thus, it is less than clear that the evidence supported a finding of torture, even in the unqualified sense of the word.)

Second, the Nevada Supreme Court's phrase "serious physical abuse" is taken from the longer formulation in *Robins* ("serious and depraved physical abuse beyond the act of killing itself"). The state district court had not found serious physical abuse. Indeed, it had not mentioned physical abuse, serious or otherwise. Because the state district court had made no such finding, there was nothing in that court's order with respect to "serious physical abuse" with which the Nevada Supreme Court could have agreed.

Third, the Nevada Supreme Court stated that, as it viewed the evidence, the victim "died not from one wound but from all the wounds combined." This view of the evidence is inconsistent with the court's application of the narrowed version of the instruction that it was purporting to apply. As noted above, *Robins* requires that there be "serious and depraved physical abuse *beyond the act of killing itself*" (emphasis added). If, as the Nevada Supreme Court believed, the victim died from all the wounds combined, the wounds did not constitute abuse beyond the act of killing itself.

We therefore conclude that the Nevada Supreme Court did not engage in the "close appellate scrutiny" required by *Stringer* and *Jeffers,* and that its analysis under *Walton* did not cure the erroneous jury instruction, even if it could have done so.

### D. Harmless Error

Based on the foregoing, we know that the depravity of mind aggravating-circumstance jury instruction was unconstitutionally vague, and that the Nevada Supreme Court did not cure the instructional error. We must therefore determine whether the error was harmless.

#### 1. Harmless Error Analysis When a *Walton* Analysis is Unavailable

We have held that state appellate court factfinding under *Walton* is not available in this case because the aggravating and mitigating circumstances were found by a jury rather than a judge. Because the instructional error was not cured (and was not curable) under *Walton,* it is possible that the use of the unconstitutionally vague "depravity of mind" jury instruction is not susceptible to harmless error review. In *Maynard v. Cartwright* and *Godfrey v. Georgia,* the Supreme Court reversed outright the death sentences based on unconstitutionally vague aggravating jury instructions, without engaging in any harmless error analysis. *See Maynard,* 486 U.S. at 363–66, 108 S.Ct. 1853; *Godfrey,* 446 U.S. at 432–33, 100 S.Ct. 1759. However, *Maynard* and *Godfrey* were both decided before *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and the impact of *Brecht* on the analysis in those cases is not entirely clear. We need not decide whether the structural error approach of *Maynard* and *Godfrey* should be applied because we hold that the *Brecht* harmless

error standard should be applied, if a *Walton* analysis is available, based on the failure of the Nevada Supreme Court to provide "close appellate scrutiny." As we discuss in the next section, the instructional error was not harmless under *Brecht.*

### 2. Harmless Error Analysis When There Has Been No "Close Appellate Scrutiny"

■■■ We have also held that, even if a *Walton* analysis is available, the Nevada Supreme Court failed to cure the instructional error because it did not provide the required "close appellate scrutiny." Under this view of the case, we must determine which of two possible harmless error standards applies. The first is the "rational factfinder" standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The second is the "substantial and injurious effect or influence" standard of *Brecht.* For the reasons that follow, we believe that *Brecht* provides the appropriate standard in this case.

### a. Harmless Error under *Jackson v. Virginia*

If a *Walton* analysis were available in this case despite the fact that the penalty-phase factfinder was a jury, and if the state appellate court had provided the required "close appellate scrutiny," we would evaluate the case under the "rational factfinder" standard of *Jackson.* Under *Jackson,* a federal habeas court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). In *Jackson* itself, the "rational factfinder" standard was applied to factfinding by the trial-level factfinder when no error, other than insufficiency of the evidence, was as-

serted. In *Jeffers,* 497 U.S. at 781, 110 S.Ct. 3092, the Supreme Court extended *Jackson* to factfinding by a state appellate court under *Walton.*

In *Jeffers,* the Court held that when a state appellate court, acting under *Walton,* provides a constitutionally valid narrowing interpretation of an aggravating circumstance, and then finds, on *de novo* review of the evidence, that the circumstance existed, a federal habeas court should provide a deferential review. "Where the issue is solely whether a state court has properly found the existence of a constitutionally narrowed aggravating circumstance, we have never required federal courts 'to peer majestically over the [state] court's shoulder so that [they] might second-guess its interpretation of the facts that quite reasonably—perhaps even quite plainly—fit within the statutory language.'" *Id.* at 780–81, 110 S.Ct. 3092 (citation omitted). "[A] federal court should adhere to the *Jackson* standard even when reviewing the decision of a state appellate court that has independently reviewed the evidence[.]" *Id.* at 783, 110 S.Ct. 3092.

However, we do not believe that the *Jackson* standard should be applied in this case. *Jeffers'* application of the *Jackson* "rational factfinder" standard is premised on the state appellate court's actually having performed the required "close appellate scrutiny" when it engaged in a *Walton* analysis. In the ordinary case, comity would require that we assume that the state court provided "close appellate scrutiny" when it made a *de novo* evidentiary determination that the constitutionally narrowed aggravating circumstance existed. But where, as here, it is clear from the face of the state appellate court's order that it has not provided such scrutiny, the premise for applying the *Jackson* standard does not exist.

### b. Harmless Error under *Brecht v. Abrahamson*

The usual standard for harmless error on federal habeas corpus for state prisoners is provided by *Brecht*. We hold that the *Brecht* harmless error standard applies when there has been a failure to engage in the "close appellate scrutiny" required when a state appellate court engages in a *Walton* analysis. Under *Brecht*, an error is not harmless if it has a " 'substantial and injurious effect or influence in determining the jury's verdict.' " 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The state, rather than Valerio, bears the "risk of doubt" in our harmless-error analysis. *See O'Neal v. McAninch*, 513 U.S. 432, 439, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Thus, the state must provide us with a "fair assurance" that there was no substantial and injurious effect on the verdict. *Gray v. Klauser*, 282 F.3d 633, 651 (9th Cir.2002); *United States v. Hitt*, 981 F.2d 422, 425 (9th Cir.1992). *See also O'Neal*, 513 U.S. at 443, 115 S.Ct. 992 ("the State normally bears responsibility for the error that infected the initial trial"); *Payton v. Woodford*, 299 F.3d 815, 828 (9th Cir.2002) (en banc) ("Only if the State has persuaded us that there was no substantial and injurious effect on the verdict do we find the error harmless.").

■ Under the *Robins* narrowing construction, the jury should have been asked whether, beyond a reasonable doubt, the murder involved "torture, mutilation, or other serious and depraved physical abuse beyond the act of killing itself." In the instruction that was actually given, the jury was asked whether, beyond a reason- able doubt, the murder involved "torture, depravity of mind or mutilation of the victim." The jury answered "yes." Valerio has not challenged the constitutionality of the *Robins* narrowing construction, and we assume for purposes of this analysis that it is constitutional. The question for us, therefore, is whether the actual instruction had a "substantial and injurious effect or influence" on the jury's verdict, in comparison to what the verdict would have been if the narrowed instruction had been given.

Under the narrowed instruction, Valerio's counsel could have argued much more effectively than under the actual instruction that the aggravating circumstance was not present. We know that the prosecutor himself conceded that the evidence did not support a finding of "torture," even under the pre-*Robins* broad definition of torture. The prosecutor could still have argued under *Robins* for a finding of "mutilation," as he did during the actual penalty-phase trial, and for a finding of "serious physical abuse." But the prosecutor would have had greater difficulty making those arguments, for, under *Robins*, the mutilation and serious physical abuse must have been caused by an act "beyond the act of killing itself." 106 Nev. at 629, 798 P.2d 558.[8]

Based on the evidence in the record, a juror could readily have concluded that the victim died from the cumulative effect of all her wounds. The Nevada Supreme Court, in affirming the denial of Valerio's petition for post-conviction relief under NRS 177, stated as much, acknowledging the evidence that the victim "died not from one wound but from all wounds combined." If this is so, a juror could readily have concluded that none of the wounds consti-

---

8. Under *Robins,* the phrase "beyond the act of killing itself" modifies all three conditions: torture *or* mutilation *or* depraved physical abuse. 106 Nev. at 629, 798 P.2d 558. *See* *also Browne v. State,* 113 Nev. 305, 316, 933 P.2d 187 (Nev.1997) ("Mutilation requires an act beyond the act of killing itself.").

tuted mutilation or serious physical abuse "beyond the act of killing itself."

If a single member of the jury had been convinced under the narrowed construction that there was a reasonable doubt in favor of Valerio, the jury could not have returned a verdict finding that the aggravating circumstance existed. Given the relative ease with which a juror could have come to that conclusion based on the evidence presented, we conclude that the erroneous instruction had a "substantial and injurious effect or influence" on the verdict, and that the *Brecht* standard was met.

We therefore reverse the district court and remand with instructions that, should the district court not issue a writ with respect to the guilt phase of Valerio's trial, it shall grant the petition for a writ of habeas corpus as to the penalty phase, unless the state within a reasonable period of time either grants a new penalty trial or vacates the death sentence and imposes a lesser sentence consistent with law.[9] The district court is also directed to provide any appropriate interim relief, pending a final decision on Valerio's guilt-phase claims, resulting from our holding that the death penalty was improperly imposed.

We next consider whether to grant a COA as to the issues that relate to the guilt phase of Valerio's trial.

### III. Applicability of Circuit Rule 22–1

Valerio sought to appeal the denial of his second federal habeas petition after the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. His appeal is therefore controlled by the appellate review provisions of AEDPA. *See Slack v. McDaniel,* 529 U.S. 473, 480–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). AEDPA requires that a habeas petitioner obtain a COA of specified issues as a precondition for appellate review. The requirement states, in pertinent part:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from:
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; * * *
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c).

▆▆▆ The word "judge" in § 2253(c)(1) includes not only a circuit judge but also a district judge. That is, both circuit and district judges have the authority under § 2253(c)(1) to grant COAs. *See United States v. Asrar,* 116 F.3d 1268, 1270 (9th Cir.1997); *see also* Fed. R.App. P. 22(b)(1) ("In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, ... the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c).... If the district judge has denied the certificate, the appli-

---

**9.** The federal district court also granted a COA, and Valerio has pursued an appeal, on claim 15, on the issue of the sufficiency of the evidence, during the penalty phase, of torture and mutilation. To some degree, analysis of this issue has been subsumed in our analysis of the erroneous aggravating-circumstance jury instruction. To the degree that this issue is free-standing, it is moot in light of our granting of the writ as to the penalty phase.

cant may request a circuit judge to issue the certificate."). Although neither AEDPA nor Federal Rule of Appellate Procedure 22 specifically so provides, a court of appeals not only has the power to grant a COA where the district court has denied it as to all issues, but also to expand a COA to include additional issues when the district court has granted a COA as to some but not all issues. *See Hiivala v. Wood,* 195 F.3d 1098, 1104 (9th Cir.1999) (per curiam); *Cruz–Mendoza II,* 163 F.3d at 1149–50; *Cruz–Mendoza I,* 147 F.3d at 1074–75, *amended and superseded in part by Cruz–Mendoza II.*

We promulgated Ninth Circuit Rule 22–1 to specify detailed procedures for COA applications under § 2253(c) and Rule 22, including procedures for applying for an expanded COA. That rule provides, in pertinent part:

> (d) *Partial Denial By District Court; Motion By Petitioner.* If the district court denies a certificate of appealability in part, the court of appeals will not consider uncertified issues unless petitioner first seeks, and the court of appeals grants, broader certification. Petitioners desiring broader certification must file, in the court of appeals, a separate motion for broader certification, along with a statement of reasons why a certificate should be granted as to any issues(s) within thirty-five days of the district court's entry of its order denying a certificate of appealability.

Ninth Cir. R. 22–1(d).[10]

We addressed the applicability of Circuit Rule 22–1 to a petitioner in Valerio's situation in *United States v. Zuno–Arce,* 209 F.3d 1095 (9th Cir.2000), *amended by* 245 F.3d 1108 (9th Cir.2001). *Zuno–Arce* held that Rule 22–1 applies to a petitioner whose request for a COA was partially denied more than thirty-five days prior to the effective date of Rule 22–1, but whose briefing was completed after the effective date of the rule. 209 F.3d at 1100–01. For the reasons that follow, we overrule our decision in *Zuno–Arce.*

The effective date of Circuit Rule 22–1 was January 1, 1999. Prior to the adoption of Rule 22–1, we had no applicable circuit rule. In the absence of such a rule, we had held on June 23, 1998 that a petitioner who had received a partial COA from the district court could apply for an expanded COA from the court of appeals by the simple expedient of briefing the uncertified issue or issues to us. *See Cruz–Mendoza I,* 147 F.3d at 1074 ("We now hold that, in the interest of efficiency, where a district judge has issued a COA on some but not all of the issues, we will treat the briefing of an uncertified issue as a request for a COA and first decide whether one should issue."). In so holding, we cited and followed the practices of the Sixth and Seventh Circuits. *See id.* (citing *In re Certificates of Appealability,* 106 F.3d 1306, 1307 (6th Cir.1997) (administrative order); *Williams v. Parke,* 133 F.3d 971, 975 (7th Cir.1997)).

Valerio timely filed his notice of appeal in the district court on September 18, 1998. The district court entered an order granting the COA as to some issues and denying it as to others on October 15, 1998. Both dates are after our decision in *Cruz–Mendoza I* and before the effective date of Circuit Rule 22–1. That is, when Valerio filed his notice of appeal and when the district court partially granted and partially denied his request for a COA, the clearly stated, then-effective law of this circuit was that it was sufficient for a habeas petitioner to brief to the court of

---

**10.** We note that we are currently considering amendments to Circuit Rule 22–1. However, those amendments have not yet been promulgated.

appeals the issues for which he sought an expanded COA.

Circuit Rule 22–1 changed the practice approved in *Cruz–Mendoza I*. The rule provides that petitioners wishing to expand a COA must file *"within thirty-five days of the district court's entry of its order denying a certificate of appealability"* a *"separate motion for broader certification"* in the court of appeals. Ninth Cir. R. 22–1 (emphasis added). When the rule became effective on January 1, 1999, two and one-half months had elapsed since the district court's partial denial of Valerio's request for a COA. Therefore, as of the effective date of the rule, Valerio could not possibly have complied with its requirement that a separate motion be filed within thirty-five days of the district court's denial.

Valerio never made a separate motion to this court for an expanded COA. Rather, he simply briefed the issues as to which he sought an expanded COA, in accordance with the practice we had endorsed in *Cruz–Mendoza I* six months before the effective date of Rule 22–1.[11] The question before us is whether Valerio's failure to make a separate motion for a COA, analogous to the separate motion specified in Rule 22–1, prevents him from obtaining an expanded COA, even though he has briefed the relevant issues to us. Stated otherwise, the question is whether the "separate motion" provision of Rule 22–1 applies, in a manner not specified in the rule, to a habeas petitioner who is unable to comply with the rule as it is written. Our answer is "no."

Supreme Court and Ninth Circuit case law both lead us to the same result. In *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Court wrote, "Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." But a rule may not be applied retroactively when doing so would "attach[ ] new legal consequences to events completed before its enactment." *Id.* at 270, 114 S.Ct. 1483. Changes to previously established procedural practices or rules must be examined to determine whether or not application of a new or changed rule to pending cases is appropriate. *Id.* at 275 n. 29, 114 S.Ct. 1483 ("Of course, the mere fact that a new rule is procedural does not mean that it applies to every pending case.").

▮ In *Volkswagenwerk Aktiengesellschaft v. Church*, 413 F.2d 1126 (9th Cir. 1969), we declined to apply a revised circuit rule shortening the time period for lodging exceptions to a cost bill to an appeal pending at the time the rule was adopted. We noted in *Volkswagenwerk* that the order adopting the new rule at issue had provided:

> [The new rule] shall govern in all such proceedings ... then pending, except to the extent that in the opinion of the court of appeals their application to a particular proceeding then pending *would not be feasible or would work an injustice*, in which case the former procedure may be followed.

*Id.* at 1127 (emphasis added).[12] We wrote, "[w]e think that in this case we should

---

**11.** *Cruz–Mendoza I* was amended on December 31, 1998, to conform to Circuit Rule 22–1, which became effective the next day. *See Cruz–Mendoza II*, 163 F.3d 1149, 1149. By the time *Cruz–Mendoza I* was amended, two and one-half months had elapsed since the district court's partial denial of Valerio's request for a COA. *Cruz–Mendoza II* did not

decide whether Rule 22–1 should be applied in that case. Rather, it held that Cruz Mendoza had in any event not satisfied the criteria for issuance of a COA. *See* 163 F.3d at 1149–50.

**12.** We note that amendments to Federal Rules of Procedure are generally accompanied by an order of the Supreme Court providing that

apply the former [rule] in order to avoid injustice." *Id.* at 1127–28. Even in the absence of such a specific statement in the order adopting a new circuit rule, our holding in *Volkswagenwerk* is applicable. Where the application of a new circuit rule—either directly or by analogy—would not be feasible or would work an injustice, that new rule should not be applied. Even where we do not explicitly so state, we view such a statement as implicit in the promulgation of any circuit rule.

Circuit Rule 22–1, by its own terms, has no provision applicable, in any respect, to a petitioner in Valerio's position. The rule does not, for example, direct a petitioner for whom more than thirty-five days have already elapsed at the effective date of the rule to file a separate motion within thirty-five days of the effective date. In the absence of any direction to a petitioner in Valerio's position—or, indeed, any acknowledgment that someone in his position even existed—it was not unreasonable for Valerio to assume that the rule simply did not apply to him. This is particularly so given that, prior to the adoption of the Rule, *Cruz–Mendoza I* had specifically approved briefing to the court of appeals as a mechanism for seeking an expanded COA. *See* 147 F.3d at 1074.

We therefore hold that Circuit Rule 22–1 does not apply, either directly or by analogy, to habeas appeals in which an expanded COA is sought in the court of appeals, and in which the district court's order denying a COA was entered before the effective date of the Rule. For such cases, we hold that the procedure we approved in *Cruz–Mendoza I*, in which briefing of the uncertified issue or issues in the court of appeals is treated as a request for

an expanded COA, is available to a petitioner. In the case before us, we specifically hold that Valerio's briefing of issues as to which the district court denied a COA is a procedurally proper request to this court for an expanded COA.

There are two groups of claims for which Valerio sought an expanded COA. In the first group are three newly added claims that the district court dismissed for abuse of the writ. In the second group are numerous claims that the district court dismissed because of asserted procedural default in state court. All of these claims relate to the guilt phase of Valerio's trial. We now turn to the two groups of claims, and consider whether to grant an expanded COA.

## IV. Abuse of the Writ

### A. Application of *Slack v. McDaniel*

Because Valerio's first federal habeas corpus petition contained exhausted and unexhausted claims, the district court properly dismissed the petition under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). After Valerio presented his unexhausted claims to the state court, he filed a new habeas petition in federal court. The new petition contains not only the now-exhausted claims, but also three new claims that had not been presented in the previous federal petition. Relying on our decision in *Farmer v. McDaniel*, 98 F.3d 1548 (9th Cir.1996), the district court dismissed these newly added claims as an "abuse of the writ." After the district court dismissed Valerio's newly added claims, the Supreme Court reversed *Farmer* in *Slack v. McDaniel*, 529 U.S.

the rules are to be applied to pending appeals only "insofar as just and practicable." *See, e.g.,* Order of April 24, 1998, West Federal Criminal Code and Rules 341 (2002); Order of April 23, 1996, *id.;* Order of April 27, 1995,

*id.;* Order of April 29, 1994, *id.* at 340; Order of April 22, 1993, *id.;* Order of April 30, 1991, *id.;* Order of April 25, 1989, *id.;* Order of March 10, 1986, *id.;* Order of April 30, 1979, *id.*

473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Valerio has now sought an expanded COA that would include these three claims. Following the procedure set forth in *Slack,* and based on *Slack's* reversal of *Farmer,* we grant an expanded COA as to these claims.

■ We may grant Valerio's request for an expanded COA only if he has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court has relied on a procedural ground to dismiss a claim, our decision whether to grant a COA has "two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding." *Slack,* 529 U.S. at 484–85, 120 S.Ct. 1595. *See also Petrocelli v. Angelone,* 248 F.3d 877, 883 (9th Cir.2001). Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA. *Id.* at 884.

We first address the procedural holding of the district court. Valerio satisfies the procedural component of *Slack* if he shows "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack,* 529 U.S. at 484, 120 S.Ct. 1595. Rule 9(b) of the Rules Governing Section 2254 Cases provides: "A *second or successive petition* [alleging new and different grounds] may be dismissed if . . . the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an *abuse of the writ*" (emphasis added). The district court concluded, relying on *Farmer,* that Valerio's second federal habeas petition was a "second or successive petition" under Rule 9(b), and that the inclusion of the three new claims was an abuse of the writ. However, the Supreme Court subsequently held in *Slack* that a federal habeas petition filed after an earlier peti-

tion has been dismissed for failure to exhaust is not a "second or successive petition" within the meaning of Rule 9(b). *See Slack,* 529 U.S. at 486–87, 120 S.Ct. 1595.

Because dismissal of a claim for abuse of the writ under Rule 9(b) is premised on the supposedly abusive claim's having been included in a second or successive petition, such a dismissal is not available when the earlier petitions were dismissed for failure to exhaust. *See id.* The district court's dismissal of Valerio's three new claims for abuse of the writ was thus based on an erroneous view of the law, for, as we now know from *Slack,* Valerio's second federal habeas petition was not a second or successive petition within the meaning of Rule 9(b). Our conclusion that the district court erred "more than meets *Slack's* requirement that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Petrocelli,* 248 F.3d at 885 (quoting *Slack,* 529 U.S. at 478, 120 S.Ct. 1595).

■ We next address the underlying constitutional rights asserted in Valerio's three newly added claims. Under the second component of *Slack,* Valerio must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." 529 U.S. at 484, 120 S.Ct. 1595. Because the claims were dismissed on procedural grounds by the district court and were not developed or argued on the merits in that court, we "simply take a 'quick look' at the face of the complaint to determine whether the petitioner has 'facially allege[d] the denial of a constitutional right.'" *Petrocelli,* 248 F.3d at 885 (citations omitted).

■ The new claims are an amendment to claim 16(h), and new claims 17(m) and 25. Amended claim 16(h) and claim 17(m) allege that Valerio received ineffec-

tive assistance of counsel in violation of the Sixth Amendment. Claim 25 alleges that the prosecution withheld exculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because all three claims facially allege violations of constitutional rights, the substantive component *of Slack* is clearly satisfied.

We therefore grant the broadened COA and remand to the district court to allow it to deal appropriately with Valerio's three newly added claims.

### B. Unexhausted Claims and Mixed Petition

■ It is possible that none of the three newly added claims has been exhausted in state court. Two of the three—amended claim 16(h) and claim 17(m)—are based on ineffective assistance of counsel, and *may* be exhausted. Valerio has already presented IAC claims to the state court, and those IAC claims are exhausted. If the two new claims are sufficiently related to the exhausted claims, they, too, are exhausted. The question under *Humphrey v. Cady,* 405 U.S. 504, 517 n. 18, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), is whether they are "so clearly distinct from the claims ... already presented to the state courts that it may fairly be said that the state courts have had no opportunity to pass on the claim." The district court has not yet applied a *Humphrey* analysis, and we will not prejudge the result here. It is enough for our purposes to note that the two new IAC claims may, or may not, be exhausted. The third new claim—claim 25—is a *Brady* claim. Valerio has made no *Brady* claim to the state courts, and this claim therefore appears to be unexhausted. The claim may be time-barred in state court, *see, e.g.,* NRS 34.726, NRS 34.800; *see also Pellegrini,* 34 P.3d at 526,

but we are not in a position to decide that question.

■ When the district court decided the merits of Valerio's claim that the depravity of mind jury instruction was unconstitutional, there were no pending unexhausted claims. The district court had dismissed the three newly added claims for abuse of the writ, and thus when the district court acted the petition did not contain both exhausted and unexhausted claims. The district court thus did not violate the rule of *Rose v. Lundy,* which forbids a district court to decided exhausted claims that are contained in a "mixed" petition. *See* 455 U.S. at 510, 102 S.Ct. 1198.

■ However, because of our holding that the district court erred in dismissing the claims for abuse of the writ, we have now revived the three claims. Once we have revived these claims, we are faced with the question of whether we should decline to rule on an exhausted claim contained in the mixed petition that we have created. We believe that despite the revival of these three claims in this court, we are acting appropriately in deciding Valerio's exhausted claim that the depravity-of-mind jury instruction was unconstitutional. *See* Part II, *supra.*

■ The prohibition against deciding an exhausted claim in a mixed petition is not jurisdictional. The Supreme Court made this clear in *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where it decided an exhausted claim decided by a district court in a mixed petition, holding that "the exhaustion rule requiring dismissal of mixed petitions, though to be strictly enforced, is not jurisdictional."

Moreover, the strictness of the prohibition against ruling on claims in mixed petitions is primarily directed at the district

courts. Indeed, *Rose v. Lundy* itself is directed *only* at the district courts. *See, e.g.,* 455 U.S. at 510, 522, 102 S.Ct. 1198 ("[W]e hold that a *district court* must dismiss such 'mixed petitions[.]' "; "[W]e hold that a *district court* must dismiss habeas petitions containing both unexhausted and exhausted claims.") (emphases added). In *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), the Court addressed the courts of appeals, emphasizing that "there are some cases in which it is appropriate for an appellate court to address the merits of a habeas corpus petition, notwithstanding the lack of complete exhaustion." In that case, where the State had not raised exhaustion as a defense, the Court remanded to the court of appeals to allow it "to determine *whether the interests of justice would be better served* by addressing the merits of the habeas petition or by requiring additional state proceedings before doing so." *Id.* at 134, 107 S.Ct. 1671 (emphasis added). For the reasons that follow, we believe that the "interests of justice would be better served" by addressing the merits of Valerio's fully exhausted jury instruction claim.

First, at the time the jury instruction claim was decided by the district court, the petition was not mixed, and the district court acted in full compliance with *Rose v. Lundy.* Then, when Valerio and the State briefed and argued to us, neither of them mentioned to us the problem that might be created if we revived the claims. *Compare Simmons v. Blodgett,* 110 F.3d 39, 41 (9th Cir.1997) ("While we might otherwise be concerned that it is contrary to the interests of comity for a federal court to act on habeas review while an appeal is pending in the state court system, in this case the State has not raised the point.... Because exhaustion is not jurisdictional, we have no sua sponte obligation to pursue the problem further."). Indeed, at the time the three-judge panel decided Valerio's appeal to this court, *Slack v. McDaniel* had not been decided, and the basis for reviving the claims did not even exist.

Second, to the degree that there is a problem, we created it. That is, only when we revived the three claims in this court did the petition become mixed. We also created the problem in another sense. The district court dismissed the three claims for abuse of the writ because it was following our holding in *Farmer v. McDaniel.* The Supreme Court then overruled *Farmer* in *Slack.* If we had decided *Farmer* correctly, the district court would have been able, in the first instance, to determine whether some or all of the newly added claims were exhausted. The district court would then have been able to exercise its discretion under *Calderon v. District Court (Taylor),* 134 F.3d 981, 989 (9th Cir.1998), to determine whether to grant a stay and hold Valerio's petition in abeyance to allow Valerio to exhaust. If the district court had declined to allow the stay-and-abeyance procedure of *Taylor,* Valerio could then have decided whether to dismiss his unexhausted claims in order to proceed with his exhausted claims.

In another case in which we created a similar problem, we decided a number of unexhausted claims. In *Hendricks v. Zenon,* 993 F.2d 664 (9th Cir.1993), petitioner alleged a violation of his Sixth Amendment right to counsel on appeal when he had been obliged to represent himself in the state appellate court on direct appeal. He also alleged a number of other constitutional violations, none of which had been presented to the state appellate court in a counseled appeal. We held that his Sixth Amendment right had been violated and granted the writ unless the state allowed a counseled appeal. We recognized that because the non-Sixth Amendment claims would now almost cer-

tainly be presented to the state appellate court, they had been rendered unexhausted by our Sixth Amendment holding: "[W]e now find ourselves in the position of having 'unexhausted' the remainder of[petitioner's] Constitutional claims." *Id.* at 672. We nevertheless decided these unexhausted claims, stating that "we believe it to be in the interests of justice to exercise our authority and to decide these issues now rather than later." *Id.* If we appropriately believed it to be in the "interests of justice" to decide petitioner's unexhausted claims in *Hendricks,* where we created the exhaustion problem ourselves, the appropriate course in the present case is easy to discern. In this case, where we also created the problem, we now decide not numerous *unexhausted* claims, as in *Hendricks,* but rather a single *exhausted* claim.

Third, the jury instruction claim is obviously one of the most important—possibly the most important—claim in Valerio's petition. Valerio sought and received COAs on three specifically enumerated issues in the district court. The remainder of his request for a COA in the district was a general, undifferentiated request as to all other issues, which was denied by that court. On appeal to us, Valerio pursued two of the three COAs that were granted by the district court, both of which focused on the depravity of mind aggravating-circumstance jury instruction. And as we have held, *supra* Part II, the unconstitutionality of that instruction compels a granting of the writ as to the penalty phase.

By contrast, the three claims that now may make this a mixed petition are relatively unimportant. The two IAC claims are additions to already exhausted IAC claims, and it is not clear how much they add to those claims. (Moreover, as dis-

cussed above, it is not even clear that these two claims are unexhausted.) The *Brady* claim may have substantive merit, but there is an obvious possibility it will be held timebarred in the state courts if Valerio attempts to exhaust it. (If so, it is possible that the claim is exhausted because it is procedurally barred. *See Phillips v. Woodford,* 267 F.3d 966, 974 (9th Cir.2001) ("[T]he district court correctly concluded that Phillips's claims were nonetheless exhausted because 'a return to state court would be futile.' ").) If we allow the presence of these three revived claims to prevent us from reaching the merits of Valerio's jury instruction claim, we will be allowing a very small tail to wag a very large dog.

Finally, the interests of judicial efficiency would be served by deciding Valerio's jury instruction claim now. To state it bluntly, to send this case back to the district court without deciding the jury instruction claim would be a colossal waste of time. At some point, "judicial ping-pong between the state and federal courts" serves no useful purpose. *Harris v. Reed,* 489 U.S. 255, 270, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (O'Connor, J., concurring). We believe that we have reached that point in this case.

## C. Procedure on Remand

▮▮▮▮▮▮ Although a district court must dismiss a "mixed" petition, containing both exhausted and unexhausted claims, *see Rose v. Lundy,* it may not dismiss a mixed petition without giving the petitioner the opportunity to delete the unexhausted claims. *See Tillema v. Long,* 253 F.3d 494, 503 (9th Cir.2001). However, if Valerio's potentially unexhausted claims are deleted in order to allow the exhausted claims to go forward immediately,[13] the

---

13. Because we remand some exhausted claims, as discussed in Part V, *infra,* some

now-unexhausted claims will be time-barred by AEDPA's one-year statute of limitations if they are exhausted and then refiled in federal court. *See* 28 U.S.C. § 2244(d). In order to avoid exceeding the limitations period for the newly added claims, the district court may, in its discretion, grant a stay and hold Valerio's petition in abeyance during the pendency of the state court proceedings for these claims. *See Taylor*, 134 F.3d at 989; *James v. Pliler*, 269 F.3d 1124, 1127 (9th Cir.2001) (suggesting that district court on remand might grant stay-and-abeyance). If the district court declines to grant a stay, it must inform Valerio that, absent equitable tolling, he will be time-barred under AEDPA on all of his claims if he does not choose to dismiss his unexhausted claims in order to proceed in federal court with his exhausted claims.

## V. Procedural Default in State Court

After Valerio's first federal habeas corpus petition was dismissed because it contained unexhausted claims, Valerio filed another petition for post-conviction relief in state court, this time a petition for

properly exhausted claims will again be before the district court.

**14.** The claims in Valerio's current federal petition are identical to, and have the same numbering as, the claims in his second state petition, with the exception of the three newly added claims, an amendment to 16(h), and claims 17(m) and 25.

**15.** NRS 34.810 provides:

1. The court shall dismiss a petition if the court determines that:
* * *
(b) The petitioner's conviction was the result of a trial and the grounds for the petition could have been:
(1) Presented to the trial court;
(2) Raised in a direct appeal or a prior petition for a writ of habeas corpus or post-conviction relief; or

habeas corpus under NRS Chapter 34. (As recounted *supra*, Valerio's first petition for post-conviction relief was filed under NRS Chapter 177.) The new state-court petition contained 24 claims, some with numerous subparts.

The Nevada district court divided the claims into two groups and, in an unpublished order, dismissed all of them. The first group contained claims 1–18.[14] The Nevada district court wrote that Valerio "concede[d]" that all of these claims had been previously raised. It held them barred by NRS 34.810(2), which provides, in relevant part: "A second or successive petition must be dismissed if the judge or justice determines that it fails to allege new or different grounds for relief and that the prior determination was on the merits . . . ."[15]

The second group contained claims 19–24. These were new claims based on what Valerio alleged to be recently recollected conversations with his trial counsel. The state district court held these claims barred by the second clause of NRS 34.810(2), which provides, in relevant part:

(3) Raised in any other proceeding that the petitioner has taken to secure relief from his conviction and sentence, unless the court finds both cause for the failure to present the grounds and actual prejudice to the petitioner.
2. A second or successive petition must be dismissed if the judge or justice determines that it fails to allege new or different grounds for relief and that the prior determination was on the merits or, if new and different grounds are alleged, the judge or justice finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.
3. Pursuant to subsections 1 and 2, the petitioner has the burden of pleading and proving specific facts that demonstrate:
(a) Good cause for the petitioner's failure to present the claim or for presenting the claim again; and
(b) Actual prejudice to the petitioner.

"A second or successive petition must be dismissed if ... new or different grounds are alleged, [and] the judge or justice finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ." The state district court held, further, that Valerio's failure to present these claims earlier was not excused under NRS 34.810(3) because he had not shown "good cause" and "actual prejudice."

On appeal, the Nevada Supreme Court affirmed in a published opinion. See Valerio v. State, 112 Nev. 383, 386, 915 P.2d 874 (Nev.1996). As to claims 1–18, it noted that the state district court had been mistaken, in that only some (rather than all) of these claims had previously been presented to a state court. Without specifying which claims had, and which claims had not, previously been presented, the Nevada Supreme Court upheld the state district court's dismissal of all of them:

> As for the grounds among claims 1–18 which have not been determined on the merits, we hold that the district court properly dismissed these grounds pursuant to NRS 34.810 since Valerio could have raised them in his first petition, and his failure to do so constituted an abuse of the writ.

> We further hold that the district court did not err in dismissing those grounds among claims 1–18 which had been determined on the merits. These claims may not be raised again because this court's prior orders dismissing them constitute the law of the case.

Id. at 386–87, 915 P.2d 874 (emphasis in original). As to claims 19–24, all of which were newly presented, the Nevada Supreme Court agreed with the district court that Valerio had failed to present them earlier and that he had not shown "good cause" and "actual prejudice" that would excuse his failure. Id. at 388, 915 P.2d 874.

■■■ In reviewing Valerio's second federal habeas petition, the federal district court held that some of Valerio's claims had been properly raised and exhausted in state court and were therefore not procedurally defaulted for purposes of federal habeas review.[16] The district court dismissed all of those claims on the merits. Valerio requested a COA on all of the dismissed claims, but the district court only granted the request as to three penalty phase claims.[17] Valerio did not argue in his briefs to us that the COA should be expanded to address the guilt phase claims that the district court dismissed on the merits. Because we construe Valerio's briefs as a request for an expanded COA only on the issues discussed therein, see discussion supra Part III, Valerio's failure

---

16. Because Valerio had presented the claims in his first petition, brought pursuant to NRS Chapter 177, the Nevada Supreme Court held that these claims were barred for state purposes when Valerio raised them again in his Chapter 34 petition. However, the claims had been presented to the Nevada state courts and thus were properly exhausted, and not procedurally barred, for purposes of federal review. Those claims are 1–3 (asserting prejudicial admission of evidence); 9 (improper and prejudicial closing argument during the guilt phase); 13 (improper closing argument by the prosecutor in the penalty phase); 14 (vague instruction on aggravating circumstance in the penalty phase); 15 (insufficiency of the evidence of torture and mutilation); 16(a), (f), (h), (i), (m), (q)-(s), (x), and (y) (ineffective assistance of trial counsel); and 17(b), (d), (j), and (l) (ineffective assistance of appellate counsel).

17. As noted earlier in the opinion, those claims were numbers 13, 14 and 15. Valerio did not pursue claim 13 on appeal. Claim 14 is the basis for our setting aside the death penalty. To some extent, claim 15 is subsumed in our analysis of claim 14; to the extent claim 15 is freestanding, it is moot in light of our holding as to claim 14.

to contest in his briefs the district court's dismissal of his guilt phase claims means that those claims are not properly before us.[18]

Valerio did, however, contest in his briefs the district court's finding that his remaining guilt phase claims were procedurally defaulted. The district court agreed with the Nevada Supreme Court that Valerio had procedurally defaulted those claims among claims 1–18 that had never been presented to the Nevada state courts, and on that ground dismissed those claims.[19] The district court also agreed that claims 19–24 were procedurally defaulted and dismissed them. Valerio now seeks an expanded COA on the issue of whether the district court correctly dismissed these claims as procedurally defaulted. He argues that the claims should not have been held procedurally defaulted because the state court had not applied its procedural rules with sufficient clarity and regularity.

The principles of state-court procedural default in federal habeas corpus are well-established. A federal habeas court cannot review a claimed denial of a federal constitutional right if the petitioner has failed to present the claim to the state court because of a procedural default in that court. A default under an independent and adequate state procedural rule operates as a bar in federal court unless the petitioner can show cause for and prejudice from the default. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir.1994) ("[T]he procedural default doctrine is a specific application of the general adequate and independent state grounds doctrine.").

In order for a state procedural rule to serve as an adequate state ground, it must be regularly followed by the state courts. "[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (citation omitted); *see also Poland v. Stewart*, 169 F.3d 573, 585 (9th Cir.1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court." (quoting *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991))). The rule must also be actually relied on in the particular case in question. "In habeas, if the decision of the last state court to which the petitioner presented his federal claims ... did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

18. We note that although Valerio has not requested an expanded COA to address the district court's dismissal of his guilt phase claims listed *supra* in footnote 16, he has contested in his brief the district court's dismissal of his claim of cumulative error on the ground of procedural default. Because we remand the cumulative error claim for consideration on the merits, *see* discussion *infra*, to the extent that claims 1–3; 9; 16(a), (f), (h), (m), (q)-(s), (x), (y); and 17(b), (d), (j), (*l*) are included in the cumulative error claim, they are before the district court on remand.

19. Those claims are 4–5 (prejudicial admittance of evidence during trial); 6–7 (violation of right to confrontation); 8 (prejudicial admittance of evidence during trial); 10 (improper closing argument by the prosecutor during the guilt phase); 11 (prejudicial admittance of evidence during trial); 12 (failure to preserve evidence);16(b)–16(e); 16(g); 16(j)–16(*l*); 16(n)–16(p); 16(t)–16(w); 16(z); 16(aa)–16(kk) (ineffective assistance of trial counsel); 17(a); 17(c); 17(e)–17(i); 17(k) (ineffective assistance of appellate counsel); 18 (cumulative error); 19–24 (ineffective assistance of trial counsel).

"[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review." *Morales v. Calderon*, 85 F.3d 1387, 1392 (9th Cir.1996).

We discuss Valerio's request for a COA as to the claims the district court held procedurally defaulted in two parts, tracking the Nevada Supreme Court's opinion. First, we address the claims remaining from Valerio's first group of 18 claims: claims 4–8, 10–12, and 16–18.[20] The Nevada court held these claims barred because they either had or had not been previously determined on the merits. We then discuss claims 19–24, which the Nevada Supreme Court held barred because Valerio could have presented them in an earlier petition and failed to do so.

### A. Claims 4–8, 10–12, and 16–18

Because the district court relied on a procedural ground to dismiss Valerio's supposedly defaulted claims, we apply the analysis prescribed in *Slack v. McDaniel*, evaluating both the procedural ground and the underlying constitutional claim to determine if they are "debatable" among "jurists of reason." *Slack*, 529 U.S. at 484, 120 S.Ct. 1595.

■■■ We first evaluate the procedural ground. In affirming the Nevada district court's dismissal of claims 1–18, the Nevada Supreme Court failed to specify which claims had previously been presented to the state court and could not be relitigated, and which had never been presented to state court and had been waived. The facts of this case are indistinguishable

from those in *Calderon v. United States District Court (Bean)*, 96 F.3d 1126 (9th Cir.1996). In *Bean*, two groups of claims were presented to the California Supreme Court on state habeas corpus. One group (the *Waltreus* group) had already been raised on appeal in state court and could not be presented again in state court. *See In re Waltreus*, 62 Cal.2d 218, 42 Cal.Rptr. 9, 397 P.2d 1001 (1965). The other group (the *Harris/Dixon* group) had not been raised and had therefore been waived. *See In re Harris*, 5 Cal.4th 813, 825 n. 3, 21 Cal.Rptr.2d 373, 855 P.2d 391 (1993) (discussing *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953)). In denying the petition, the California Supreme Court cited both *Waltreus* and *Harris/Dixon* as bases for its decision and did not specify which claims fell in which group. We held that the California Supreme Court order was not sufficiently clear to bar federal habeas corpus review of the claims:

> The order, which we agree with the district court is ambiguous, does not specify which of Bean's thirty-nine claims the court rejected under *Waltreus*, and which it rejected under *Harris/Dixon*. "[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review." The district court properly declined to dismiss these claims.

*Bean*, 96 F.3d at 1131 (citation omitted).

Based on *Bean* and *Coleman v. Thompson*, we hold that the district court erred in finding a state-court procedural default as to claims 4–8, 10–12, and 16–18.[21] By

---

**20.** The particular subparts of claims 16 and 17 at issue are set forth in footnote 19, *supra*.

**21.** Because we hold, based on *Bean* and *Coleman v. Thompson*, that there was no adequate state ground for finding procedural default in

state court as to claims 1–18, we do not need to reach Valerio's additional contention, as to these claims, that the Nevada state courts did not apply their procedural default rules with sufficient regularity to bar federal habeas corpus review.

failing to specify which claims were barred for which reasons, the Nevada Supreme Court "did not clearly and expressly rely on an independent and adequate state ground." *Coleman,* 501 U.S. at 735, 111 S.Ct. 2546. Our holding that the federal district court erred in finding a procedural default as to these claims necessarily means that the procedural prong of *Slack* has been satisfied.

 We next evaluate the underlying constitutional claims. Because the merits of Valerio's constitutional contentions under claims 4–8, 10–12, and 16–18 were not developed in the federal district court, the substantive prong of *Slack* requires only that we "simply take a 'quick look' at the face of the complaint to determine whether the petitioner has 'facially allege[d] the denial of a constitutional right.'" *Petrocelli,* 248 F.3d at 885 (citation omitted); *see also Lambright v. Stewart,* 220 F.3d 1022, 1026 (9th Cir.2000). Our "quick look" reveals that all of Valerio's claims facially allege the denial of a constitutional right. Claims 4, 5, 8, and 11 all allege prejudicial admission of evidence at trial. Although evidence questions are questions of state law, improper admission of evidence can amount to a due process violation if it "is clearly prejudicial and 'rendered the trial fundamentally unfair.'" *Drayden v. White,* 232 F.3d 704, 710 (9th Cir.2000) (quoting *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1466 (9th Cir.1986)). Claims 6 and 7 allege the violation of Valerio's constitutional right to confrontation under the Sixth Amendment. Claim 10 alleges improper argument by the prosecu-

tor during the guilt phase of Valerio's trial. Improper argument violates a defendant's right to due process if "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Thompson v. Borg,* 74 F.3d 1571, 1576 (9th Cir.1996) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Claim 12 alleges failure to preserve evidence. This claim, too, alleges a potential due process violation. *See United States v. Hernandez,* 109 F.3d 1450, 1455 (9th Cir.1997). The subparts of claims 16 and 17 at issue allege ineffective assistance of counsel at trial and on direct appeal in violation of the Sixth Amendment. Finally, claim 18 alleges cumulative error amounting to a due process violation. Although the standard for actually proving the due process violations Valerio alleges in these claims is high, we do not consider the merits of the claims at this point. Rather, we need only consider the face of the complaint. *See Lambright,* 220 F.3d at 1028–29.

We therefore grant an expanded COA as to claims 4–8, 10–12, and 16–18.[22] We remand to the district court for appropriate disposition of those claims.[23]

## B. Claims 19–24

As we did for claims 1–18, we follow the two-step procedure of *Slack v. McDaniel* for claims 19–24. We first evaluate the procedural component. As noted, *supra,* Valerio satisfies the procedural component of *Slack* if he shows "that jurists of reason would find it debatable whether the dis-

---

**22.** For the sake of clarity, we note again as to claims 16 and 17 that we grant the expanded COA only as to the following subparts: 16(b)–16(e); 16(g); 16(j)–16(*l*); 16(n)–16(p); 16(t)–16(w); 16(z); 16(aa)–16(kk); 17(a); 17(c); 17(e)–17(i); 17(k).

**23.** To the extent that any of these remanded claims address allegations of unconstitutional wrongs with respect to the penalty phase, including portions of claims 16(k), 16(cc)–16(kk), 17(j), and 17(k), those claims are moot in light of our granting the writ as to the penalty phase.

trict court was correct in its procedural ruling." *Slack,* 529 U.S. at 484, 120 S.Ct. 1595.

Claims 19–24 were presented to the Nevada courts for the first time in Valerio's second post-conviction petition, brought under NRS Chapter 34. The Nevada Supreme Court affirmed the holding of the district court that these claims were barred by NRS 34.810 on the ground that Valerio had not raised them in his earlier post-conviction petition under NRS Chapter 177. *See Valerio v. State,* 112 Nev. at 388–89, 915 P.2d 874. Valerio contends that his procedural default in state court does not bar our review on federal habeas corpus because Nevada state courts have not "strictly or regularly followed" the procedural bar enforced in his case. *Johnson,* 486 U.S. at 587, 108 S.Ct. 1981.

■ "In order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well-established *at the time of petitioner's purported default." Wells,* 28 F.3d at 1010 (emphasis added); *see also Ford,* 498 U.S. at 424, 111 S.Ct. 850; *Fields v. Calderon,* 125 F.3d 757, 760 (9th Cir.1997). The time of Valerio's asserted default was 1990, when he filed his petition under NRS Chapter 177. The procedural default, if any, occurred at this time because Valerio omitted the claims from his Chapter 177 petition, and it is the consequence of this omission that is in dispute. We must determine whether there was a "clear, consistently applied, and well-established" rule in Nevada state courts in 1990 that barred Valerio from asserting in a later petition claims that he failed to assert in his Chapter 177 petition.

From our review of the Nevada cases, it is plain that at the time of Valerio's default the Nevada Supreme Court in capital cases had what we frankly regard as a commendable policy of exercising discretionary *sua sponte* power to overlook failures to present constitutional claims in earlier proceedings. The court exercised this power both on direct appeal and on post-conviction review. It exercised this power when there was a failure to make the objection at trial; a failure to include the claim on direct appeal from the conviction and sentence; and a failure to include the claim in an earlier post-conviction petition. And it exercised this power in both published opinions and unpublished orders.

In *Jones v. State,* 101 Nev. 573, 707 P.2d 1128 (Nev.1985), the defendant failed to present a constitutional objection to an instruction at trial. The Nevada Supreme Court, on direct appeal, nevertheless addressed the objection on the merits. It wrote, "In a capital case where the record is sufficiently developed to provide an adequate basis for review and to demonstrate that fundamental rights are implicated, it is appropriate to hear a constitutional question for the first time on appeal." *Id.* at 580, 707 P.2d 1128. In *Flanagan v. State,* 104 Nev. 105, 754 P.2d 836 (Nev. 1988), the defendant failed to comply properly with the Nevada contemporaneous objection rule during the penalty-phase trial. The Nevada Supreme Court, on direct appeal, nevertheless decided the objections on the merits "where a life is at stake." *Id.* at 108, 754 P.2d 836. In *Hill v. State,* 114 Nev. 169, 953 P.2d 1077 (Nev.1998), the defendant failed, both in his trial in 1983 and on direct appeal in 1986, to argue that execution of a retarded person violated the Eighth Amendment. On petition for post-conviction relief, the Nevada Supreme Court addressed and rejected on the merits (without mentioning the procedural default) both an IAC claim for failing to raise the Eighth Amendment, and the Eighth Amendment claim itself. *See id.* at 176–78, 953 P.2d 1077. In *Pertgen v. Ne-*

*vada,* 110 Nev. 554, 875 P.2d 361 (Nev. 1994) (per curiam), the defendant failed to raise an IAC claim and other constitutional claims on direct appeal. On petition for post-conviction relief, the Nevada Supreme Court addressed all of the claims despite petitioner's failure to raise them on direct appeal:

> [T]he power of this court to address plain error or issues of constitutional dimension *sua sponte* is well established. Because this case involves the ultimate punishment and because appellant's claims of ineffective assistance of counsel are directly related to the merits of his claims, we will consider appellant's claims on the merits in order to determine whether appellant received ineffective assistance of counsel.

*Id.* at 560, 875 P.2d 361 (citations omitted).

In Valerio's own case, on his first post-conviction petition under NRS Chapter 177, the Nevada Supreme Court exercised its *sua sponte* power, in a 1992 unpublished order, to address a constitutional claim that Valerio had failed to present on direct appeal. As recounted, *supra,* Valerio challenged the "depravity of mind" aggravating-circumstance instruction in his Chapter 177 petition, but he had failed to challenge that instruction at trial or on direct appeal. The state district court said that the claim had not been raised, but then decided (and rejected) it on the merits. On appeal, the Nevada Supreme Court rejected the claim on the merits without mentioning the procedural default, and without analyzing it in the context of Valerio's IAC claim. *Cf. Pellegrini,* 34 P.3d at 534–35 (stating that claims not raised on direct appeal are considered in later proceedings only in the context of IAC claims).

On review of Valerio's second post-conviction petition, brought under NRS Chapter 34, the Nevada Supreme Court held in 1996 that claims 19–24 were procedurally defaulted because Valerio had failed to raise them in his earlier Chapter 177 petition. *See Valerio v. State,* 112 Nev. 383, 915 P.2d 874 (Nev.1996). The court rejected Valerio's argument that it had "inconsistently applied the procedural default and waiver rules":

> [Valerio] contends that since his petition presented errors of constitutional dimension on its face, and since this court has a "policy" of reviewing errors of constitutional dimension which appear on the face of the record irrespective of the doctrines of procedural default and waiver, the [Nevada] district court erred in failing to address the merits of Valerio's claim and should be reversed.
>
> We note at the outset that reversal of the district court's order for its failure to recognize this court's "policy" of reviewing plain constitutional error is not mandated. Moreover, arguments regarding the consistent or inconsistent applications of a procedural bar are aimed at the federal courts rather than this court. *See Kills on Top v. State,* 273 Mont. 32, 901 P.2d 1368, 1386 (1995). In any event, contrary to the assertion of the Ninth Circuit [citing *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir. 1995)], we note that this court has not inconsistently applied post-conviction procedural bars.

*Id.* at 389–90, 915 P.2d 874. One Justice dissented from the refusal to review Valerio's constitutional claims:

> I believe that this court has a proper and established policy of addressing facial errors of constitutional magnitude, in death cases [citing *Pertgen v. State,* 110 Nev. 554, 560, 875 P.2d 361 (1994); *Emmons v. State,* 107 Nev. 53, 60–61, 807 P.2d 718 (1991); *Flanagan v. State,* 104 Nev. 105, 108, 754 P.2d 836 (1988)]. I

think it should follow such a policy in this case.

*Id.* at 390, 915 P.2d 874 (Springer, J., dissenting).

Based on the foregoing, we hold that in 1990 there was no "clear, consistently applied, and well-established" rule in capital cases that prevented the Nevada Supreme Court from addressing constitutional claims on the ground that those claims had not been presented in earlier proceedings. The number and the variety of cases in which the Nevada Supreme Court addressed constitutional claims on the merits in capital cases, despite unexcused failures to present these claims in earlier proceedings, lead us to conclude that the court exercised a general discretionary power to address them.

Our conclusion comports with our prior case law addressing Nevada's procedural bar rules. We have twice held that Nevada's procedural rules barring petitioners from raising constitutional claims that could have been raised previously are not adequate to bar federal review in capital cases. In both cases we held that—at times shortly before Valerio's default—the Nevada Supreme Court had discretion in capital cases to consider constitutional claims despite a failure to raise those claims in earlier proceedings. *See Petrocelli v. Angelone*, 248 F.3d 877 (9th Cir. 2001) (failure to raise constitutional claims in earlier post-conviction petition; defaults in 1983 and 1985); *McKenna v. McDaniel*, 65 F.3d 1483 (9th Cir.1995) (failure to raise constitutional claim on direct appeal; default in 1985 or somewhat earlier).

Our holdings in *Moran v. McDaniel*, 80 F.3d 1261, 1269 (9th Cir.1996), and *Bargas v. Burns*, 179 F.3d 1207, 1211 (9th Cir. 1999), are consistent with *Petrocelli* and *McKenna*, and with our holding in this case. We held in *Moran* that the Nevada Supreme Court adhered with sufficient regularity to the specific timeliness bars contained in NRS 34.726 and NRS 34.800 for them to serve as procedural defaults in a federal habeas proceeding, even in capital cases. However, *Moran* does not affect our conclusion here that the Nevada Supreme Court did not adhere regularly to rules barring review of a constitutional claim that could have been brought in an earlier proceeding. We held in *Bargas* that Nevada's rule provides that a petitioner procedurally defaults a claim when he fails to appeal from the denial of post-conviction relief, *see id.* at 1211, but *Bargas* was not a capital case. The fact that the Nevada Supreme Court did not exercise its discretion to consider defaulted claims in non-capital cases is consistent with its use of that discretion to hear such claims when a death sentence is at issue.

We therefore hold that the procedural bar asserted by the Nevada Supreme Court in Valerio's case, preventing him from presenting claims 19–24 in his Chapter 34 petition, is not "adequate" to prevent review of those claims on federal habeas corpus. Our holding that the federal district court erred in finding these claims procedurally defaulted necessarily means that the procedural component of *Slack* has been satisfied.

Because the district court dismissed claims 19–24 for procedural default, the substantive component of *Slack* requires only that we "simply take a 'quick look' at the face of the complaint" to determine if Valerio has made a facial allegation of the denial of a constitutional right. Claims 19–24 all allege ineffective assistance of trial counsel, in violation of the Sixth Amendment. The substantive component of *Slack* is thus satisfied.

We therefore grant an expanded COA with respect to claims 19–24 and remand them to the district court.

## VI. Conclusion

With respect to the penalty phase, we hold that a *Walton* analysis is not available when a jury rather than a judge has determined whether there were aggravating and mitigating circumstances. We also hold, however, that even if a *Walton* analysis were available, the Nevada Supreme Court failed to provide "close appellate scrutiny" and therefore failed to cure the instructional error. Because we find the error not harmless under *Brecht v. Abrahamson*, we reverse the district court's dismissal of Valerio's petition as to the death penalty.

With respect to the guilt phase, we conclude that Ninth Circuit Rule 22-1 does not apply to Valerio's request for an expanded COA as to claims 4–8, 10–12, and 16–25. We therefore grant an expanded COA as to those claims. We reverse the district court's dismissal of claims 16(h), 17(m) and 25 for abuse of the writ; reverse its dismissal of claims 4–8, 10–12, 16(b)–16(e), 16(g), 16(j)–16(*l*), 16(n)–16(p), 16(t)–16(w), 16(z), 16(aa)–16(kk), 17(a), 17(c), 17(e)–17(i), 17(k), and 18–24 for procedural default; and remand all these claims to the district court for appropriate consideration.

Should the district court deny or dismiss Valerio's guilt-phase claims after appropriate consideration, we instruct the district court to grant the writ as to the death sentence unless, within a reasonable time, the state either grants a new penalty-phase trial or vacates the death sentence and imposes a lesser sentence consistent with the law. We also instruct the district court to grant such interim relief as may be appropriate during the pendency of further guilt-phase habeas proceedings.

REVERSED and REMANDED with instructions.

FISHER, Circuit Judge, Concurring.

Because neither party raised the application of *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to "appellate factfinding" when the penalty-phase factfinder was a jury, and resolution of that issue is not necessary for our conclusion, I concur in the opinion of Judge Fletcher except section II(C)(1).

RYMER, Circuit Judge, with whom Circuit Judges O'SCANNLAIN, T.G. NELSON, and GRABER join, Dissenting.

Today the majority reaches a claim that should not be reached—whether the Nevada Supreme Court could or did cure the "depravity of mind" aspect of the "torture, depravity of mind and mutilation" aggravating circumstance—and holds, without warrant, that a state supreme court may not apply a narrowing construction to an unconstitutionally vague instruction and determine that it is supported by the evidence as applied, when the penalty-phase factfinder is a jury instead of a judge.

Neither this issue nor its companion, whether substantial evidence supports the aggravator, should be reached because the effect of the court's *other* decision—to treat Valerio's briefing as a request for a broadened Certificate of Appealability (COA), and to grant that request—is to revive a number of guilt-phase claims. Some of these claims are unexhausted. This means that Valerio's petition is now a mixed petition, subject to dismissal under *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The majority recognizes this in its remand of *remaining* claims, noting that the petition must be dismissed (or stayed) if unexhausted claims are not dropped. But if the petition is mixed, it is mixed for *all* claims, not just *some* of them. The aggravating circumstance claim also should not be reached because it is a sentencing issue that may

go away given reinstatement of substantial guilt-phase claims. While we *may* decide a sentencing issue first, we do not *have* to and, in my view, the court should *not* do so particularly where (as here) the issue involves an important question of constitutional law that affects how state appellate courts review state court judgments.

Beyond this, the majority's holding that a state appellate court lacks authority to cure an unconstitutional instruction by a narrowing construction whenever the sentence is determined by a jury is simply wrong. *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), says that an appellate court has that authority and nothing said in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona,* —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), is to the contrary. Nor, if I had to get there, do I believe that the Nevada Supreme Court failed to scrutinize this case closely enough; while its analysis may not be perfectly articulated, I respect that court's citation to its own precedent, *Robins v. State,* 106 Nev. 611, 798 P.2d 558 (1990), which indicates to me that the court applied a narrowing construction and determined that the evidence supplied a cogent basis for the jury's finding of the aggravating circumstance limited in scope to the permissible construction.

I therefore dissent both from the discussion, and the decision, in Part II.

I would also come out differently on whether to treat Valerio's briefing as a request to broaden his COA. However, unlike the decision on the constitutional issue, the decision on this question is quite limited because it can only apply to petitioners who appear to have been caught in the middle during the six months between our decision on June 23, 1998, in *United States v. Cruz–Mendoza,* 147 F.3d 1069 (9th Cir.1998) (*Cruz–Mendoza I*), and the effective date of Circuit Rule 22–1(d), January 1, 1999. Still, I disagree that Valerio was actually caught in the middle. He does not purport to have relied on *Cruz–Mendoza I,* nor could he have. Nothing had happened in Valerio's appeal as of December 31, 1998, when *United States v. Cruz–Mendoza,* 163 F.3d 1149 (9th Cir. 1998) (*Cruz–Mendoza II*), amended the opinion in *Cruz–Mendoza I* in light of Rule 22–1(d). Valerio was then on notice that briefing would no longer be treated as a request for a broadened COA and that Rule 22–1(d), which states that the court of appeals will not consider uncertified issues unless a request for broadened certification is made and granted, had been adopted to clarify the procedure that would apply to COAs which had been partly granted and partly denied by the district court. Although the thirty-five day period provided in the Rule for making such a request had passed, prospectively Valerio had plenty of time to request a broadened certificate after *Cruz–Mendoza I* was withdrawn and Rule 22–1(d) became effective the first of the year, and before his brief was filed on May 12, 1999. As *United States v. Zuno–Arce,* 209 F.3d 1095 (9th Cir.2000), *amended by* 245 F.3d 1108 (9th Cir.2001), reasons similarly, I would not overrule it. Accordingly, I dissent from Part III as well.

I

A

In my view, the majority's opinion puts the cart before the horse by starting with Valerio's claim arising out of the "torture, depravity of mind, or mutilation of the victim" aggravating circumstance found by the jury. Instead, given the way the majority answers it, the foundational question turns out to be whether a broadened COA

should be granted, because a mixed petition is created by virtue of its answer. We should not review a mixed petition on the merits.

The district court denied three of Valerio's claims outright and granted a COA on each. Valerio pursues two of these claims on appeal (Claim 14, vague instruction on aggravating circumstance in penalty phase; and Claim 15, insufficiency of the evidence of torture and mutilation). The district court also dismissed a number of. claims on the ground of abuse of the writ or procedural default. It denied a COA as to these rulings, however the majority broadens Valerio's COA to include them. Having granted the COA, the majority reverses the district court's procedural rulings and remands for the district court to resolve the affected claims on the merits. But three of these claims are unexhausted. The majority recognizes that its decision to reverse the district court's procedural rulings has produced a mixed petition under *Rose v. Lundy,* and that the district court must dismiss or stay the petition unless the unexhausted claims are deleted. *See* op., *supra* at 768 and 770–71. Nevertheless, it reaches and resolves the merits of the aggravating circumstance claim, which is part of the same petition.

Because there are parts and subparts to contend with, it is easier to illustrate the problem by supposing a petition that consists of Claims A, B and C. Claim A is exhausted, was resolved on the merits, and is certified by the district court. Claims B and C were dismissed on procedural grounds, but the procedural rulings are not certified; substantively, Claim B is not exhausted although Claim C is. There is no mixed petition at this point because Claims B and C are out of the picture. On appeal, we grant a broadened COA as to Claims B and C and reverse the district court's procedural rulings. Claims B and

C are now revived on the merits. Because Claim B is not exhausted, the petition is mixed. The mixed petition includes Claims A, B and C—not just Claims B and C. All of them must be dismissed or stayed while Claim B is exhausted, unless Claim B is dropped.

I realize that exhaustion is not jurisdictional, and that courts of appeals may review the merits of a petitioner's claim in unusual circumstances even though some claims are unexhausted. However, exceptions to the general rule exist primarily when the state has waived the exhaustion requirement or when the unexhausted claim lacks merit and can easily be resolved. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (exhaustion rule requiring dismissal of mixed petitions, though to be strictly enforced, is not jurisdictional; there, unexhausted claim lacked merit); *Granberry v. Greer,* 481 U.S. 129, 135–36, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (nonexhaustion defense is waivable; there, it wasn't raised until appeal and in that event court should determine whether interests of justice would be better served by addressing merits or requiring additional state proceedings); *Acosta–Huerta v. Estelle,* 7 F.3d 139, 142 (9th Cir.1993) (noting jurisdiction to consider unexhausted claims in mixed petition if claims "clearly do not rise to the level of alleged deprivations of constitutional rights") (quoting James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 9.3(b), at 122 (1988)). There is no recognized exception for reviewing one among several exhausted claims, just because it may have merit or has been certified. Otherwise, if one of several exhausted claims could be resolved even though the petition is mixed, the rule requiring dismissal· of mixed petitions would be meaningless. That is the case here: a single, exhausted issue has been cherry-picked for review on the merits.

Moreover, the favored issue has considerable constitutional importance and raises serious federalism concerns. It is not dispositive and does not dictate the outcome of remaining claims (even as to sentencing, for there is an unresolved claim that appellate counsel was ineffective in failing to raise the aggravating circumstance issue on direct appeal). In short, the petition is mixed and *all* claims must be remanded for dismissal, stay, or deletion.

A second reason that I would not review the aggravating circumstance issue is that it is a sentencing issue that we may never have to deal with. Among other things, Valerio's guilt-phase claims challenge the effectiveness of both trial and appellate counsel, the prosecutor's compliance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and prejudicial admission of evidence, all of which the majority regards as making a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). If Valerio prevails on any one of them, his conviction would be invalidated and sentencing issues avoided. In these circumstances, it makes a good deal of sense to defer consideration of sentencing issues until issues relating to the conviction are settled. We have done so before, *see, e.g., Fields v. Woodford*, 281 F.3d 963, 981 (9th Cir.2002), and I believe that we should do so now. Prudence, in addition to *Rose v. Lundy*, counsels in favor of restraint in these circumstances.[1]

Third and finally, I would not consider the aggravating circumstance claim as posed by the majority, because the parties never developed the issue in the way that the majority frames and decides it.

B

Valerio does not argue that "*Walton* appellate factfinding [is] unavailable when [the] penalty-phase factfinder was a jury," op., *supra* at 758; indeed, Valerio acknowledges that under *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), a vague aggravating circumstance may survive a constitutional challenge where a sufficiently narrow construction is adopted and applied by a state appellate court.[2] Instead, he contends that the state courts did not cure the unconstitutional impact of the vague aggravator in his case because there was insufficient evidence of torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself to avoid the unconstitutional application of the vague aggravator; the Nevada Supreme Court and the federal district court failed to apply the narrowing construction to the aggravator such that it remains unconstitutionally vague; the Nevada Su-

---

1. This is so whether or not we have worked on the issue, for advisory opinions are to be avoided even at the cost of a "colossal waste of time." *See* op., *supra* at 770.

2. Amicus takes a position closer to that adopted by the majority, as it argues that no Nevada court can make the finding of an aggravating circumstance in place of the jury under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). It also suggests that we could so hold on collateral review because *Apprendi* is a "watershed" rule, something we have since held we

cannot do. *United States v. Sanchez–Cervantes*, 282 F.3d 664, 671 (9th Cir.2002). However, an issue raised only by an amicus, not by the parties, is not properly before the court. *Reno v. Koray*, 515 U.S. 50, 55 n. 2, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995); *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998) ("We do not review issues raised only by an amicus curiae."). In any event, the argument is not developed beyond the proposition just asserted, and no meaningful response has been addressed to it.

preme Court has inconsistently applied its limiting construction; and the state supreme court lacked authority under state law to make the findings necessary to uphold the sentence of death or the aggravating circumstance upon which it is based. These arguments can be addressed summarily.[3] However, the majority ventures out on its own to hold (a) that neither *Walton* nor any other authority allows a state appellate court to apply a narrowing construction to an unconstitutional instruction when the penalty-phase factfinder is a jury; and (b) that even if *Walton* could be used to cure an unconstitutionally vague aggravating-circumstance jury instruction, the Nevada Supreme Court did not do its job right by providing "close appellate scrutiny."

I would not go on this venture at all but, were I to, I would question each step of the way.

1

The majority assumes that *Walton* controls,[4] but characterizes *Walton* as offering a different way (in addition to reweighing and harmless error review that the Supreme Court sanctioned in *Clemons* ) for a state appellate court to affirm a death sentence after providing a narrowing construction of an aggravating circumstance. The opinion describes this as "*de novo* factfinding." Op., *supra* at 758–59. But I don't think so. Rather, *Walton* simply carries forward the *Clemons* options for a state appellate court when faced with an unconstitutionally vague aggravator: either determine whether the existence of the aggravating circumstance as properly defined is supported by the evidence—i.e., harmless error review—or reweigh. *Walton*, 497 U.S. at 653–54, 110 S.Ct. 3047 (so stating, citing *Clemons* ).[5]

---

**3.** Given the evidence of how and where Valerio stabbed the victim, a rational factfinder could have found that she was subjected to torture and/ or serious physical abuse. Valerio's argument that the repeated blows show panic or frenzy lacks any support in the record. Whether the Nevada Supreme Court failed to apply the *Robins* limiting construction correctly is a matter of state law for which federal habeas corpus relief does not lie. *Jeffers*, 497 U.S. at 780, 110 S.Ct. 3092. Likewise, the Nevada Supreme Court has held that it does not lack authority under state law to reweigh under *Clemons*. *See Canape v. State*, 109 Nev. 864, 859 P.2d 1023, 1034 (1993). It follows that it does not lack authority to conduct a harmless error review. That's what it had done in other cases, *see, e.g. Robins*, 798 P.2d at 564; *Moran v. State*, 103 Nev. 138, 734 P.2d 712, 714–15 (1987). And that's what it did here, determining that the evidence supports the existence of the aggravating circumstance as properly defined.

**4.** Although the majority's opinion decides the issue on the assumption that Walton's analysis of appellate review of death sentences controls, its approach is inevitably influenced by the view, which it also offers, that this aspect

of *Walton* "is invalid under the rationale of *Ring* [.]" Op., *supra* at 756 n. 6. However, *Ring* makes clear that it overrules *Walton* only "in relevant part." *Ring*, ——— U.S. at ———, 122 S.Ct. at 2432. The part that *Ring* overrules is the part that upheld Arizona's capital sentencing scheme on the footing that facts found by the judge qualified as sentencing considerations rather than as elements of the offense of capital murder. *Ring* found that this part of *Walton* is incompatible with *Apprendi*. But *Ring* does *not* overrule *Walton* to the extent that *Walton* has to do with appellate review of death sentences. *See Ring*, ——— U.S. at ———, n. 4, 122 S.Ct. at 2437, n. 4. Overruling *this* part of *Walton* is for the Supreme Court to do, not for us. Meanwhile, Walton's holding that a state appellate court may limit and save an unconstitutionally vague aggravating circumstance, and itself determine whether the evidence supports the existence of the aggravating circumstance, is alive and well. *See Walton*, 497 U.S. at 653–54, 110 S.Ct. 3047.

**5.** We can put reweighing aside here, because there was nothing for the Nevada Supreme Court to reweigh. It did not toss out any aggravating circumstance, rather it upheld

For this reason alone the majority's conclusion that *Walton* does not extend to jury determinations cannot stand, because that conclusion necessarily depends on the premise that *Walton* permits de novo "appellate factfinding." But harmless error analysis—although it assumes an independent review of the record—is not de novo factfinding. Rather, a state appellate court's affirming a death sentence after the jury has been instructed to consider an invalid factor simply determines that the result would have been the same had the aggravating circumstance been properly defined. *Stringer v. Black,* 503 U.S. 222, 230, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons,* 494 U.S. at 754, 110 S.Ct. 1441. This, as the Court put it in *Clemons,* is "a routine task of appellate courts." *Clemons,* 494 U.S. at 748–49, 110 S.Ct. 1441.

The majority's conclusion also cannot stand on its other central premise—that a state appellate court's ability to cure instructional error in an aggravating circumstance stems only from *Walton.* It does not. It also stems from *Clemons, Maynard,* and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Read together, these opinions make it clear that state appellate courts may cure unconstitutionally vague aggravating circumstances whether the error occurred in a judge's decision, or in a jury instruction.

The petitioner in *Godfrey* was sentenced to death by a jury based on a verdict finding that the offense of murder was "outrageously or wantonly vile, horrible and inhuman." The aggravating circumstance permitted a person to be sentenced to death if the jury found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhu-

man in that it involved torture, depravity of mind, or an aggravated battery to the victim." Even though the Georgia Supreme Court had previously upheld death sentences based on the presence of torture or an aggravated battery, in this case it affirmed solely on the basis of the jury's finding that the offense was "outrageously or wantonly vile, horrible and inhuman." The United States Supreme Court held that this application of the aggravating circumstance was unconstitutional, because a finding that a murder was "outrageously or wantonly vile, horrible and inhuman" is standardless and unchanneled. It reversed because the jury's uncontrolled discretion was "in no way cured by the affirmance of those sentences by the Georgia Supreme Court." *Godfrey,* 446 U.S. at 429, 100 S.Ct. 1759. In so holding, the Court noted that the circumstances of the case did not satisfy the criteria previously outlined by the Georgia Supreme Court (torture and aggravated battery), that the Georgia Supreme Court did not take a different view of the evidence, and that the Georgia Supreme Court could not be said to have applied a constitutional construction of the remaining phrase in the aggravator, involving depravity of mind, because the petitioner's crimes did not reflect a consciousness materially more "depraved" than that of any other person guilty of murder. Thus, the Supreme Court did not reverse because the state appellate court *could not cure* an unconstitutional aggravating-circumstance instruction, but because it *did not;* "that court failed to apply its previously recognized limiting construction of the aggravating circumstance." *Maynard,* 486 U.S. at 363, 108 S.Ct. 1853 (explaining what went wrong in *Godfrey* ).

the aggravating circumstance that the jury found (the murder involved torture, depravity of mind, or mutilation) by narrowing it to

torture and/or physical abuse. Thus, it engaged in harmless error review.

Much the same thing happened in *Maynard*. It, too, involved a jury determination of the death penalty based on three aggravating circumstances. The language of one of them—"especially heinous, atrocious, or cruel"—gave no more guidance than the language that the jury returned in its verdict in *Godfrey*. The Oklahoma Supreme Court concluded that the jury's verdict that the murder was especially heinous, atrocious or cruel was supportable, but the United States Supreme Court reversed because the state appellate court made no attempt to cure the constitutional infirmity of the aggravating circumstance. *Maynard*, 486 U.S. at 364, 108 S.Ct. 1853. Again, the Court did not fault the process. *Id.* at 365, 108 S.Ct. 1853 (noting that since the state supreme court's decision, the Oklahoma appellate courts had restricted the aggravating circumstance to those murders in which torture or serious physical abuse is present). Nor did it intimate in any way that an appellate court could not cure the constitutional infirmity of the aggravating circumstance simply because it had been found by a jury.

*Clemons* was also a jury case. Clemons argued that it was constitutionally impermissible for an appellate court to uphold a death sentence imposed by a jury that has relied in part on an invalid aggravating circumstance. This is basically the same proposition that the majority accepts, but the Supreme Court rejected. The Court held that an appellate court may weigh the valid aggravating circumstances against mitigating circumstances without the assistance of written jury findings, or it may find that the error which occurred during the sentencing process was harmless. *Clemons*, 494 U.S. at 748–54, 110 S.Ct. 1441. In *Clemons* itself, the Court could not tell what the Mississippi Supreme Court intended by its harmless error analysis. But the Court made clear that harmless error analysis is available, and that it is possible for a state appellate court to determine that the failure to instruct properly on an aggravating circumstance was harmless error if the result would have been the same had the aggravating circumstance been properly defined. *Id.* at 754 & n. 5, 110 S.Ct. 1441 (emphasizing that in *Johnson v. State*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), where the Mississippi Supreme Court had decided to remand to a sentencing jury, the United States Supreme Court "did not hold that the Mississippi Supreme Court could not have applied harmless-error analysis").

*Walton* says nothing to the contrary. The majority infers that *Walton* cannot be used to cure an unconstitutionally vague aggravating-circumstance jury instruction from the fact that the Supreme Court "found" *Maynard* and *Godfrey* "not controlling" because the death sentences in those cases had been imposed by juries. Op., *supra* at 757–58.[6] That's true, so far as it goes, but misses the point of the discussion in *Walton*. There, the trial judge found two aggravating circumstances, that the murder was "especially heinous, cruel, or depraved," and that it was done for pecuniary gain. The Arizona Supreme Court had previously given a narrowing construction to "especially hei-

6. The text from *Walton* upon which the majority relies states:

When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. *But the logic of those cases has no place in the context of sentencing by a trial judge.*
*Walton*, 497 U.S. at 653, 110 S.Ct. 3047 (emphasis added by the majority).

nous, cruel, or depraved," but the trial judge's finding that the special circumstance existed was articulated only in the vague statutory language. The petitioner argued that this failed to pass constitutional muster for the same reasons that the Court found Oklahoma's and Georgia's aggravating circumstances invalid in *Maynard* and *Godfrey*. The Supreme Court disagreed. It explained that the two prior cases were different because in both, the jury was instructed only in the bare terms of the statute *and* "in neither case did the state appellate court, in reviewing the propriety of the death sentence, purport to affirm the death sentence by applying a limiting definition of the aggravating circumstance to the facts presented." *Walton*, 497 U.S. at 653, 110 S.Ct. 3047. In other words, if a jury is the factfinder and is improperly instructed in the bare terms of a vague aggravating circumstance, the death sentence has to be reversed *unless* the state appellate court itself determines that the evidence supports the existence of the aggravating circumstance as properly defined. However, judges (unlike jurors who have to be instructed on the law) are presumed to know and to apply an aggravating circumstance according to its valid, judicially narrowed definition. Thus, if the state appellate courts have adopted a narrowing construction of the aggravating circumstance, as the Arizona Supreme Court had done with respect to "especially cruel," neither reversal nor cure is required regardless whether the statutory definition is vague when a judge makes the finding rather than a jury. But even if a judge fails to apply a narrowing construction or applies an improper construction, the Court indicated that reversal is still not required because the state appellate court may nevertheless cure that error just as *Clemons* provides. Put differently, *Walton* does not take *Clemons* review away when the factfinder is a jury; it extends it to a judge when the judge acts like a jury by finding an aggravating circumstance that is based on a constitutionally wrong interpretation of law.

If there were any doubt whether *Walton* left appellate courts able to salvage a death sentence based in part on an invalid aggravating circumstance when the penalty phase factfinder is a jury (which I don't think there is), *Stringer*, which came down after *Walton*, should dispel it. *Stringer* also involved a jury finding based on an invalid aggravating factor and it also acknowledges the availability of an appellate cure by way of harmless error analysis. *Stringer*, 503 U.S. at 230, 112 S.Ct. 1130 (noting that "[i]n order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor").

Nor does *Pertgen v. State*, 110 Nev. 554, 875 P.2d 361 (1994), *abrogated on other grounds by Pellegrini v. State*, 34 P.3d 519 (Nev.2001), upon which the majority relies, support its conclusion that a state appellate court may not cure an unconstitutionally vague aggravating circumstance found by a jury, or indicate that "[t]he Nevada Supreme Court itself now agrees that the *Walton* appellate factfinding procedure is not available when the penalty-phase factfinder was a jury," as the majority says that it does. Op., *supra* at 758. After observing in the passage cited by the majority that *Walton* is distinguishable because a judge is presumed to know the law and apply it constitutionally, whereas Pertgen's death sentence was imposed by a jury which is supposed to be correctly instructed,[7] the Nevada Supreme Court went on to state:

---

**7.** The text from *Pertgen* upon which the majority relies is as follows:

Our inquiry does not end at this juncture, however. In *Clemons v. Mississippi*, the United States Supreme Court confirmed that reweighing and harmless error analyses, though not required, are constitutionally permissible under appropriate circumstances. Likewise, it is permissible for us to remand for resentencing when the circumstances necessitate such action. We have elected to follow each of these alternatives under appropriate circumstances.

*Pertgen*, 875 P.2d at 366 (internal citations omitted). Thus, all that the Nevada Supreme Court did in *Pertgen* was to recognize that it has discretion to cure or to remand. While the United States Supreme Court has said that state appellate courts *may* cure an unconstitutionally vague aggravating circumstance found by a jury, of course it has never said that state appellate courts *must* do so. *See Clemons*, 494 U.S. at 754 n. 5, 110 S.Ct. 1441 (noting that harmless error analysis is alternative to remand). Rather than line up with the majority's view of *Walton*, the *Pertgen* court actually performed a harmless error analysis but concluded that the error in Pertgen's case wasn't harmless beyond a reasonable doubt. Be this as it may, the majority has now held that *Walton* does not allow a state appellate court to apply a narrowing construction to an unconstitutional instruction when the penalty phase factfinder has been a jury. To me, this breaks new ground. Therefore, in addition to everything else, today's decision implicates *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), because it announces a new rule in a federal habeas corpus proceeding.

Although the Court [in *Walton*] upheld the imposition of a death sentence, *Walton* is factually distinguishable from the present case. In *Walton*, the death sentence was imposed by a trial judge, who is presumed

For all these reasons, I would not reach the issue whether the Nevada Supreme Court could cure the "torture, depravity of mind and mutilation" aggravating circumstance, but if forced to, I would hold that the Nevada Supreme Court could apply a narrowing construction to the unconstitutionally vague instruction in this case and determine that the aggravating circumstance found by the jury is supported by the evidence as applied.

2

Alternatively, the majority holds that the Nevada Supreme Court failed to give "close appellate scrutiny" to its application of the narrowing definition that it adopted for the "torture, depravity of mind and mutilation" aggravating circumstance. This comes from *Stringer*, which requires "close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases." *Stringer*, 503 U.S. at 230, 112 S.Ct. 1130. While it may have been more helpful had the Nevada Supreme Court's analysis been more detailed, this is not a complicated case and I have no trouble understanding what the court did and why.

I assume by its citation to *Robins* that the Nevada Supreme Court considered and rationally applied its own recent precedent. Thus, the court concluded that the "torture, depravity of mind and mutilation" aggravating circumstance was not based solely upon a "depravity of mind" aspect as it was in *Godfrey*, but also on torture and serious physical abuse. Nevada's aggravating circumstance contains

to know the law and to apply it in a constitutional manner. By contrast, in this case the death sentence was imposed by a jury. *Pertgen*, 875 P.2d at 366.

such limiting language and is construed "as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind."[8] *Robins,* 798 P.2d at 570. The evidence supplied "a cogent basis" for the jury's finding of the aggravating circumstance limited in scope by this construction. The reason is: "evidence that Ms. Blackwell was stabbed more than forty-five times, had 'defensive wounds' on her hands and arms, and died not from one wound but from all wounds combined, satisfies us that she was subjected to torture and/or serious physical abuse before she died." Order Dismissing Appeal at 1 n. 2 (Nev.S.Ct. Jan. 24, 1992). This shows me that the Nevada Supreme Court conducted an independent review of the evidence and concluded that the aggravating circumstance instruction was not unconstitutionally vague as applied.

While reasonable minds can certainly disagree about the disposition's clarity, I question how the state's highest court can fall short of "close" appellate scrutiny simply by stating that it "agreed" with the trial judge that the murder involved "torture (or serious physical abuse)" when the

trial judge had only discussed torture, and that it was "satisfied" that this is what the evidence showed. Op., *supra* at 759. I should think it unremarkable that torture encompasses "serious physical abuse" when, as here, the victim was stabbed forty-five times by a knife, mostly in patterns of eight, on targeted parts of her body.[9] Nor would I fault the Nevada Supreme Court for stating that the evidence "satisfies us" that the victim was subjected to torture and physical abuse. Op., *supra* at 758–59. It is *supposed* to be satisfied that the evidence supports the existence of the aggravating circumstance as properly defined. *See Walton,* 497 U.S. at 654, 110 S.Ct. 3047 (citing *Clemons*). Nothing in the Constitution requires us to disturb that conclusion. While the court could have said "convinces us" or it could have said "persuades us sufficiently," I am satisfied that the Nevada Supreme Court believed that torture and/or serious physical abuse had been proved. While it also could have said "beyond a reasonable doubt," I do not doubt that the state's highest court knows what the standard is in a criminal case. Finally, it is hard for me to understand the majority's quarrel with the Nevada Supreme Court's conclusion that the victim was tortured or seriously physically

**8.** Ever since *Robins,* the Nevada Supreme Court has construed NRS 200.033(8) as an aggravating circumstance where the murder involves torture or serious physical abuse, a term that it uses synonymously with mutilation. *See, e.g., Jones v. State,* 107 Nev. 632, 817 P.2d 1179, 1181 (1991) (before decision in *Valerio* ); *see also Smith v. State,* 114 Nev. 33, 953 P.2d 264, 266 n. 3 (1998) (indicating Nevada Supreme Court practice since *Robins* ).

**9.** The majority makes much of the fact that the state declined to argue that Valerio subjected the victim to *torture,* but that can't make a difference because the prosecutor's focus was on *mutilation.* His closing argued: "We have a body here, the body of Karen Sue Blackwell, which had 45 knife wounds, three,

I can't remember the number, some abrasions to the top of the head. This body was mutilated, was it not from the top of the head to the vaginal area. That body was mutilated, pure and simple. That must be the definition of mutilation." Defense counsel likewise focused on mutilation, arguing: "Is it a mutilation worse than others? Well, this certainly is worse than you have in some murders, yeah. It's not one gunshot wound. It's also not as bad as you have in some other cases. So you have to decide. No limbs were cut off. It's not one of those cases where you read in the paper the head was found separated from the body. It's not one of the cases where you find words carved in the body. Is it mutilation? You have to decide."

abused even though she wasn't killed by the first stab but from all forty-five of them. To me, stabbing a person forty-two or —three or —four times more than necessary to kill is not at all inconsistent with the narrowed version of the instruction that requires abuse "beyond the act of killing itself." But regardless, how Nevada interprets its own limiting construction is a matter of state law that is not cognizable on federal habeas review. *See Jeffers*, 497 U.S. at 780, 110 S.Ct. 3092. Therefore, whether we think it is a sensible view of state law, or not, is immaterial.

In any event, the majority has concluded that the Nevada Supreme Court fell short of the mark. Having done so, I would be guided by what the Supreme Court did in *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). There, it held that the Supreme Court of Arizona did not cure a sentencing judge's error in giving weight to an unconstitutionally vague aggravating factor because two justices who concurred in affirming the sentence did not actually perform a new sentencing calculus, as required for reweighing. The Court returned the case to the district court "to enter an order granting the petition for a writ of habeas corpus unless the State of Arizona within a reasonable period of time either corrects the constitutional error in petitioner's death sentence or vacates the sentence and imposes a lesser sentence consistent with law." *Id.* at 52, 113 S.Ct. 528. Similarly, if the only deficiency is that the Nevada Supreme Court failed to give close enough scrutiny to satisfy this court, Nevada courts should have another crack at doing so.

3

Assuming that I got there, my own harmless error determination would also differ from the majority's. The majority opts to apply the harmless error standard in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (substantial and injurious effect or influence) because of its view that the *Walton* analysis is unavailable. I would follow the Supreme Court's direction in *Jeffers* to adhere to the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), rational factfinder standard. *Jeffers*, 497 U.S. at 781, 110 S.Ct. 3092. Also, Valerio concedes that *Jackson* is the applicable standard. Either way, I cannot say that the Nevada Supreme Court got it wrong or that any rational factfinder would have found anything but torture or serious physical abuse (mutilation). In short, the error was harmless.

Karen Blackwell was twenty-seven years old when she went to Valerio's house on September 19, 1986. Ten days later, her partially clothed body was found in the back seat of a car parked at a Las Vegas apartment complex.

Blackwell had been stabbed forty-five times, had blunt trauma lacerations to the right side of the head, and had "defensive" wounds or cuts in the left upper arm, and right hand. Most of the wounds occurred in groups of eight. There were eight stab wounds on the top of her head, in a cluster of about two inches. These wounds penetrated the skin but did not go into the skull. Blackwell was stabbed eight times on the front of her neck, again in a small cluster, and eight times in a cluster on the back of her neck. Valerio also stabbed Blackwell eight times (in an arc) in the right breast, and eight times in the left breast. Then there were three stab wounds in the abdomen, leading down to one stab wound in the vaginal area.

When found, Blackwell's body was wrapped in Valerio's bedding. Blood was found in Valerio's bedroom. Blackwell's

keys and an address book with her name and phone number were in the pockets of Valerio's jacket (seized in a search of his house).

Based on this evidence, I would hold that a rational factfinder could have found that Valerio subjected Blackwell to torture or serious physical abuse. *See, e.g., Jones v. State,* 113 Nev. 454, 937 P.2d 55, 68 (1997) (evidence of thirty-five wounds, including a cluster of seven to the victim's right breast, is mutilation). Neither do I have any doubt that any reasonable juror who heard the testimony and saw the exhibits would find otherwise. Therefore, in my view, the Nevada Supreme Court could reasonably have concluded that the offense Valerio committed involved torture or serious physical abuse beyond the act of killing itself, and its conclusion is rationally supported by the evidence.

## II

I also part company with the majority's approach to broadening the Certificate of Appealability. The chronology shows why Valerio's briefing should not count as a request to expand his COA, so I recite it completely.

Since April 24, 1996, appeals from dismissal of habeas corpus petitions have been governed by the certificate of appealability requirements of AEDPA. 28 U.S.C. § 2253(c). However, AEDPA simply provides that an appeal may not be taken from a final order in a habeas corpus proceeding unless "a circuit justice or judge" issues a COA that indicates the specific issues upon which the petitioner has made a substantial showing of the denial of a constitutional right. We decided early on that requests for a COA could

be made in the first instance to the district court, *United States v. Asrar,* 116 F.3d 1268, 1270 (9th Cir.1997), and 1998 amendments to Rule 22(b) of the Federal Rules of Appellate Procedure, effective December 1, 1998, assumed the same thing. Amended Rule 22(b)(1) also provided that, "[i]f the district judge has denied the certificate, the applicant may request a circuit judge to issue the certificate." But there was no specific provision in statute or rule for what should happen when the district court grants a COA in part and denies it in part.

We first considered how to treat such cases in *Cruz–Mendoza I.* The petitioner there had filed a § 2255 petition, which the district court denied. He sought a COA in the district court on all issues, but it was not granted on one of them. He did not separately request a COA from a motions panel of our court on the uncertified issue, but briefed it and requested in his opening brief that a COA be granted. We held that, "in the interest of efficiency, where a district judge has issued a COA on some but not all of the issues, we will treat the briefing of an uncertified issue as a request for a COA and first decide whether one should issue." *Cruz–Mendoza I,* 147 F.3d at 1074 (footnote omitted). This decision was rendered on June 23, 1998.

The district court dismissed Valerio's § 2254 petition on August 19, 1998. He filed a notice of appeal September 18, 1998, and on October 15, 1998, the district court granted a COA as to Ground 14 (vague instruction on aggravating circumstance in penalty phase) and Ground 15 (insufficiency of the evidence on torture and mutilation) but otherwise denied it.[10]

The scenario in *Cruz–Mendoza I* highlighted the need for a procedure to handle

---

**10.** The court also granted a COA on a third ground, but Valerio does not pursue it on

appeal.

situations where the district court partly denies a request for a COA. After a three-month period of notice and comment, Circuit Rule 22–1(d) was adopted in December 1998 to deal with the problem. It had an effective date of January 1, 1999. Rule 22–1(d) states that the "court of appeals will not consider uncertified issues unless petitioner first seeks, and the court of appeals grants, broader certification." It then tells petitioners that those desiring broader certification must file a separate motion, with reasons, within thirty-five days of entry of the district court's order denying a COA. Valerio does not dispute that he had notice of the Rule.

Stating that Rule 22–1(d) was intended to clarify how cases should be handled in which the district court had declined to certify some of the issues, the *Cruz–Mendoza* panel amended *Cruz–Mendoza I* on December 31, 1998. *Cruz–Mendoza II* deleted that part of *Cruz–Mendoza I* which had held that when a district judge has issued a COA on some but not all issues, briefing of an uncertified issue would be treated as a request for a COA. *Cruz–Mendoza II*, 163 F.3d at 1149.

Valerio requested and received a number of extensions after January 1 for filing his opening brief on appeal. However, he did not request that the COA be broadened. He filed his opening brief May 12, 1999. The brief does not request a COA on uncertified issues, but discusses them.

In its answering brief the state asserted that Valerio's arguments with respect to procedural default and abuse of the writ should not be considered because they were not certified. Valerio responded that he had made these arguments in the district court, hence it would not be unfair to the state for them to be considered by this court; that AEDPA is inapplicable to his petition; and that regardless, he could show the denial of a constitutional right so he meets the AEDPA standard.

After oral argument, the panel provided the parties a tentative decision and an opportunity to respond to it. The tentative disposition indicated that AEDPA applies to the petition, and that the court would not reach uncertified issues on which Valerio had failed to request a broadened COA. Valerio's response did not mention or challenge the refusal to consider uncertified issues. Nor did Valerio's response request that the COA be expanded.

After the decision was filed, Valerio filed a petition for rehearing which argued for the first time that as of October 16, 1998, when the district court granted in part and denied in part his request for a COA, this court allowed a petitioner to brief uncertified issues and to construe that briefing as a request for certification on those issues.[11] He pointed out that the thirty—five days allowed in the Rule would have expired on November 20, 1998—before the Rule's effective date. In these circumstances, he contended that application of Rule 22–1(d) produces a harsh and unjustified result, and violates due process, by penalizing him for failing to comply with a rule that was not in existence at the time he would have been required to comply. However, Valerio did not indicate that he had relied on *Cruz–Mendoza I*, did not argue that *his* briefing should be construed as a request for certification, and did not request a broadened certification or give reasons why it should be granted.

Absent any request in any form, I do not believe that the court has any obligation

---

11. Normally arguments raised for the first time in a motion to reconsider, that could have been raised before, are waived. *Beech* *Aircraft Corp. v. United States,* 51 F.3d 834, 841 (9th Cir.1995).

sua sponte to determine if uncertified issues should be considered. Neither do I believe that it was impracticable for Valerio himself to make a request, and to give reasons, for broadening the certification. He knew that regardless of what we held in *Cruz–Mendoza I*, Cruz–Mendoza II indicated that as of December 28, 1998, this court would no longer consider the mere briefing of an issue as a request for an expanded COA. This was four months before Valerio's opening brief was filed: *Cruz–Mendoza II* came down *December 31, 1998;* his opening brief was not filed until *May 12, 1999.* He could not possibly have relied on the *unamended* version of *Cruz–Mendoza,* and does not claim that he did. Neither does he claim ignorance of *Cruz–Mendoza II.* In short, Valerio had plenty of time to ask this court to consider uncertified issues, but never did.

Valerio has offered no explanation for failing to ask this court to consider uncertified issues. AEDPA requires a COA. He only obtained part of what he asked for from the district court. This court cannot review uncertified issues. So he had to get permission, somehow. AEDPA prescribes no particular procedure. *Cruz–Mendoza I*—which did—said that briefing would suffice, but it was withdrawn long before Valerio filed his brief.

Rule 22–1(d) replaced *Cruz–Mendoza I* and restates the obvious: a petitioner must seek permission to pursue uncertified issues from the court of appeals, and certification must in fact be granted. As we observed in *Hiivala v. Wood,* 195 F.3d 1098, 1103 (9th Cir.1999), " § 2253 must limit appellate review to issues specified in the COA because, if it did not, allowing a habeas petitioner to raise uncertified issues would render meaningless the specification language of § 2253(c)(3)." In this respect, Rule 22–1(d) is a procedural device that opened an avenue for petitioners

to seek a broader certification from the court of appeals that does not exist in AEDPA. The fact that Rule 22–1(d) also sets a time frame that had passed in Valerio's case when the Rule became effective does not shield him from the fundamental point that an issue has to be certified to be considered. The heart of the Rule is not the time limit; time limits are, after all, routinely extended and grace periods are allowed. The heart of the Rule is that "the court of appeals will not consider uncertified issues unless petitioner first seeks, and the court of appeals grants, broader certification."

Neither this post-AEDPA reality, nor the timing requirements of Rule 22–1(d), attached new legal consequences to *anything* that Valerio had completed before it was enacted; *nothing* had been done on this appeal before Rule 22–1(d) became effective. The normal practice in these circumstances is to apply a procedural rule to pending cases when doing so is "just and practicable." *See, e.g.,* Order of April 23, 1996, West Federal Civil Judicial Procedure and Rules 442 (2002) (amendments to the Federal Rules of Appellate Procedure "shall govern all proceedings in appellate cases thereafter commenced and, insofar as just and practicable, all proceedings in appellate cases then pending"); *Landgraf v. USI Film Prods.,* 511 U.S. 244, 275, 114 S.Ct. 1483 (1994) (retroactive application of new procedural rules does not raise due process concerns where application is just and practicable); *Volkswagenwerk Aktiengesellschaft v. Church,* 413 F.2d 1126, 1127–28 (9th Cir.1969) (same). Indeed, in *Hiivala,* 195 F.3d at 1103, we stated that "Circuit Rule 22–1 and the Advisory Committee Note became effective before this case was submitted for decision. It would appear, therefore, that we should apply the Rule to Hiivala's appeal." This is what we held in *Zuno–*

*Arce,* and its reasoning is persuasive. *See Zuno–Arce,* 209 F.3d at 1100–01.

Applying the Rule is practicable. Although it certainly would have been impossible for Valerio to ask this court for a broader certification within thirty-five days of the district court's order because he did not know that he was supposed to, this changed as of December 31, 1998. As of then he knew for sure that he had to seek broader certification *apart from briefing.* Valerio suggests no reason why it was impracticable to do so. Instead, Valerio chose to ignore both *Cruz–Mendoza II* and this court's statement in Rule 22–1(d) that it would not consider uncertified issues, and to brief uncertified issues anyway without, even then, acknowledging that the issues were uncertified or requesting that they be certified.

In these circumstances I do not believe that it is unjust to decline to treat briefing as the functional equivalent of a request to broaden the COA. That option was withdrawn four months earlier, and therefore could engender no expectations. Valerio and amicus now argue that injustice will result because the uncertified issues have merit. But this cannot be the proper measure, for then we would always consider issues that have been waived if they are meritorious but wouldn't if they aren't. This is not our practice. *See, e.g., Parrino v. FHP, Inc.,* 146 F.3d 699, 704 (9th Cir. 1998); *London v. Coopers & Lybrand,* 644 F.2d 811, 814 (9th Cir.1981).

The majority's focus on the absence of direction in Rule 22–1(d) to a petitioner in Valerio's position seems misplaced to me, for it leads them to conclude that it was not unreasonable for Valerio to assume that the Rule did not apply to him—particularly, as the opinion states, "given that, prior to the adoption of the Rule, *Cruz–Mendoza I* had specifically approved briefing to the court of appeals as a mechanism for seeking an expanded COA." Op., *supra* at 765. However, I do not see how this can be so in light of the demise of *Cruz–Mendoza I* four months before Valerio's briefing was submitted. In sum, Valerio made no request for a broadened COA. After *Cruz–Mendoza II,* there was no basis for him to assume that briefing would be treated as a request for broader certification. Valerio knew this. He has not offered any compelling reason why Rule 22–1(d) could not practicably and justly be applied to petitioners, such as he, who had submitted no briefing in reliance on *Cruz–Mendoza I.* Far more than thirty-five days elapsed, even if Valerio's briefs should be treated as a viable request. Thus, for the reasons explained in *Zuno–Arce,* which I would not overrule, I would not consider the uncertified issues.

### III

### *Conclusion*

Although I would not reason as the majority does in granting a broadened COA, I appreciate why it feels impelled to do so. However, having broadened Valerio's COA to include all claims previously dismissed on procedural grounds, and having reversed the district court's ruling on abuse of the writ and state-court procedural default, the court has revived all of Valerio's guilt-phase claims including several that are unexhausted. The petition is now a mixed petition, which is subject to dismissal. I would not pick out one among many exhausted claims to make new constitutional law on, particularly when the claim that is singled out is a sentencing claim. There is no need to resolve whether the Nevada Supreme Court may, or did, cure an unconstitutionally vague aggravating-circumstance instruction unless and until it is determined that no writ shall issue on the guilt phase. But if the merits are reached, a state appellate court may sal-

vage a jury's finding of an aggravating circumstance by a narrowing construction that applies to the facts of the case. The United States Supreme Court has said so repeatedly. Here, any rational factfinder could find that stabbing the victim forty-five times in clusters of eight on her head and neck and breasts and elsewhere was murder with torture or serious physical abuse. Accordingly, I would affirm the district court's denial of the writ.